[No. B195416. Second Dist., Div. One. Aug. 7, 2008.]

WINFRED D., Plaintiff and Appellant, v.
MICHELIN NORTH AMERICA, INC., et al., Defendants and Respondents.

**COUNSEL**

Girardi and Keese, David R. Lira, Shahram A. Shayesteh, David N. Bigelow; The Mandell Law Firm, Laurence H. Mandell and Robert J. Mandell for Plaintiff and Appellant.

Yukevich Calfo & Cavanaugh, James J. Yukevich, Thomas Borncamp and Emily Hicks for Defendants and Respondents.

OPINION

**MALLANO, P. J.**—Plaintiff was in the business of transporting Asian produce from markets in Los Angeles to several establishments in Las Vegas. He rented a cargo van for that purpose. On August 23, 2004, while transporting produce to Las Vegas, the right rear tire delaminated, causing a vehicle rollover. Plaintiff sustained a severe brain injury.

Plaintiff filed this personal injury action against the designer and the manufacturer of the tire, alleging defects in the right rear tire. Defendants contended that plaintiff caused the accident by overloading the vehicle with produce. At trial, over objection, the trial court permitted defendants to introduce evidence that, while plaintiff was married to his first wife, he had an affair with, and later married, his business partner's wife; he then had two wives; plaintiff falsely told his second wife, before marrying her, that he had divorced his first wife; he eventually divorced his second wife; and he thereafter had an affair with a third woman, with whom he had two children. The trial court reasoned that this evidence was relevant to plaintiff's credibility and the cause of the accident. The jury returned a verdict for defendants.

The questions on appeal are whether the evidence of plaintiff's private life should have been admitted and, if not, whether it prejudiced the case. We conclude that evidence of plaintiff's illicit, intimate conduct was not relevant; to the extent the evidence was relevant, it should have been excluded as unduly prejudicial in response to plaintiff's motion under Evidence Code section 352; and its admission caused a miscarriage of justice. The disputed evidence was so inflammatory it appears reasonably probable that had it been excluded, plaintiff could have obtained a verdict in his favor. We therefore reverse for a new trial.

I

BACKGROUND

The following allegations, facts, and testimony are taken from the pleadings, motions, depositions, and evidence at trial.

On February 3, 2005, plaintiff Winfred D. filed this action against Michelin North America, Inc., and Michelin Americas Research and Development Corporation (collectively Michelin), alleging that Michelin was liable for the delamination of a tire on the vehicle he was driving on August 23, 2004, causing him to lose control of the vehicle and sustain severe injuries,

including head trauma.[1] The complaint alleged causes of action for negligence, strict products liability, and breach of express and implied warranties—all related to the design, manufacturing, maintenance, marketing, and warranties of the tire. Winfred's wife, Celinia D., whom he married in 1970, alleged a cause of action for loss of consortium. She dismissed her claim before trial. Winfred and Celinia had two sons, one in his late 20's, the other in his early 30's, at the time of the accident.

At the first session of Winfred's deposition, Michelin asked him several questions about his private life, such as: did he get a divorce from Celinia in Mexico in 1983; did he get married to Rosalinda V. in 1984; did he live with Rosalinda for two years in Los Angeles; did he tell Celinia he was married to Rosalinda; was he married to Celinia and Rosalinda at the same time; had he visited a mistress on any of his trips to Las Vegas; and did he father two children by his mistress, Maria P.? These questions were met with objections by Winfred's attorney and instructions not to answer on grounds of relevancy and privacy. Winfred refused to provide answers.

Winfred was also asked, "Who is Maria [P.]?" Without objection, he answered, "I don't recall." After several more questions relating to Maria, all of which were answered, "I don't recall," counsel for Michelin asked, "Sir, did you ever have children with Maria [P.]?" Winfred's attorney objected on the ground of privacy and instructed Winfred not to answer. Winfred followed that advice. Winfred was then asked a series of questions about the identity of any sons he had in Nevada and whether he supported them financially. Based on privacy objections, Winfred did not give any answers.

James Merikangas, M.D., a neuropsychiatrist, testified at his deposition that the accident caused Winfred to: (1) suffer a "demonstrable loss of brain tissue and loss of brain function"; (2) experience "difficulties with his cognition in every sphere"; and (3) have problems "in moving, speaking, thinking, perceiving, having emotions, and controlling his body." From a medical standpoint, the accident made Winfred function "as if he were retarded"; he was "below 98 percent of the population in his intelligence and his general ability to function." Dr. Merikangas stated that Winfred was "incompetent" to give testimony in that "his memory is flawed," and "he has confabulation"—"he says things that he believes to be true which may not be because of his brain injury." Dr. Merikangas had read Winfred's deposition transcripts and thought Winfred lied when he said he could not remember the name of the woman (Maria) who bore his illegitimate children. According to Dr. Merikangas, Winfred's answer to that question was "an indication that he has brain damage because someone who wasn't brain damaged

---

[1] For ease of reading and to protect the privacy of plaintiff and certain others, we do not disclose their last names.

wouldn't have responded the way [Winfred] did." Dr. Merikangas opined that Winfred had made a "bad strategic decision" because of his brain injury.

Tony Feuerman, M.D., a neurosurgeon retained by Winfred as a consultant, noted that Winfred suffered a stroke in 1995 but had made a complete recovery. Dr. Feuerman stated that the 2004 accident fractured Winfred's skull, caused bleeding on the outside of the brain, and made his scalp swell. In general, as the bleeding of the brain increases, a person's cognitive functions, including thinking and memory, deteriorate. Winfred also developed fluid on the brain. His condition worsened, and he required surgery. Two holes were drilled in his skull, one on each side of his head, to release the fluid and relieve the pressure on the brain. In addition, Winfred's brain was bruised in the front and middle lower areas, which may lead to problems with memory, thinking, and speech. As of February 2006, Winfred suffered from encephalomalacia, or loss of brain tissue. His brain had several holes (as distinguished from the two holes drilled in his skull) filled with fluid that previously contained brain tissue. There was also insufficient blood flow to the brain.

Dr. Feuerman administered a test to evaluate Winfred's memory, speech function, and ability to calculate. Winfred's score was "normal" for a person with a fourth grade education; Winfred was a college graduate. During a medical examination, Dr. Feuerman learned that Winfred had a poor attention span and would "drift[] off subject" when answering questions. Winfred also had difficulty naming objects and repeating phrases. Dr. Feuerman concluded that, as of April 17, 2006, Winfred had problems with his memory, thinking, writing, and walking, among other things. With the exception of the difficulty in writing, the other conditions will never improve. Dr. Feuerman was confident that Winfred was not faking his medical problems.

As for Winfred's physical difficulties, Celinia had to help him take a shower, go to the bathroom, and get dressed.

In June 2006, the month before trial, Winfred filed an in limine motion to exclude evidence and argument regarding his "multiple marriages and extramarital affairs." By this time, Celinia had dismissed her loss of consortium claim. The motion asserted that evidence of Winfred's illicit conduct was irrelevant (Evid. Code, §§ 210, 350) and was more prejudicial than probative because it would create a substantial danger of undue prejudice, of confusing the jury, or of misleading the jury (id., § 352; all section references are to the Evidence Code unless otherwise indicated). Michelin filed opposition based on the deposition testimony of Winfred and Dr. Merikangas, arguing that Winfred was using his brain injury as an excuse to make conscious strategic decisions about when to answer a question and when to feign memory loss.

Michelin contended that Winfred's failure to answer questions about his second marriage (to Rosalinda), his subsequent affair (with Maria), and his illegitimate sons tended to disprove that he had memory problems; instead, Michelin argued, it proved he was a liar. In fact, Winfred had not disclosed any of his illicit activities to his Los Angeles family. By order dated July 21, 2006, the trial court denied the motion without a statement of reasons.

Trial began on July 24, 2006. During opening statement, one of Winfred's attorneys, David Lira, described (1) Winfred's business—transporting "exotic" vegetables and fruits from markets in Los Angeles to restaurants and businesses in Las Vegas; (2) the accident that occurred on August 23, 2004; (3) Winfred's brain injury and cognitive deficits; and (4) the alleged defects in the right rear tire. Lira also talked about his client, saying:

"[Winfred] was raised and educated in the Philippines. . . . [I]n 1969, he received a Bachelor's of Science degree in mechanical engineering from the Mapua Institute of Technology in Manila. A year later he immigrated to the United States, to New Jersey . . . , to work for Chevron. A year later he met Celinia and they were married in New Jersey. Four years later, in 1983, he was given a job transfer by Chevron to Los Angeles, where he has resided ever since.

"In the late 1980's, [Winfred] had an entrepreneurial spirit and decided, you know I'm going to try my hand at starting some businesses. While working for Chevron, . . . he started a sausage factory here in Los Angeles that he operated for several years. He opened a dry food store in Las Vegas. He opened a restaurant in Las Vegas. [Winfred] was living the American Dream, attempting to try his hand at different businesses.

". . . [I]n the mid-1980's, he realized that maybe my business is providing produce to all these businesses in Las Vegas from Los Angeles, because . . . [y]ou are not going to find exotic vegetables from the Orient out there. So he decided he would create a niche market for himself by being the one person who will gladly travel to Las Vegas weekly to deliver this produce. . . .

"Since the 1980's, he has been driving one time, two times weekly to Las Vegas for these trips. . . . He wanted to personally go that often to call upon his clients there. [¶] . . . [¶] The only time he rented a vehicle from Enterprise [Rent-A-Car] was for the purpose of delivering produce from Los Angeles to Las Vegas. That is the sole destination [for] the use of these vans."

Attorney James Yukevich made the opening statement on behalf of Michelin. He began by explaining that Winfred allegedly caused the accident by allowing the vehicle to be overloaded with produce; the tire was not

defective. Yukevich did not finish his opening statement by the end of the day. The next morning, out of the presence of the jury, Yukevich argued to the trial court that, when he resumed, he should be allowed to mention Winfred's extramarital affairs because Lira had "opened the door" to the subject during his initial remarks. Lira argued otherwise. A colloquy between Lira and the trial court ensued:

"The Court: It goes to credibility, among other things. [Y]ou essentially are appealing to the jury: Here's an American who's living the American Dream. He's coming from where? The Philippines?

"Mr. Lira: Yes.

"The Court: He expands his business. It turns out he apparently has several motives in expanding his business, at least as far as Las Vegas. [¶] Isn't the defendant entitled to point that out? [¶] . . . [¶] You are appealing to the emotions of the jury in the first place. . . . Why even mention living the American Dream? That's an appeal to the heart strings, an appeal to sympathy. Help this poor man out. He's come here from abroad, struggling to improve his life.

"Mr. Lira: That was not my intent, Your Honor.

"The Court: Well, that's clearly the implication I took from it. And I think many jurors do, too. *So let's let it all come out. I cannot find, on the basis of what I've heard, that the plaintiff is unduly prejudiced by this. It can be explained.*" (Italics added.)

The jury was brought in. About half way through his remaining statement, Yukevich said: "What happened on the day of the accident? Well, I suppose that it's only fair—and I regret really doing this, or telling you this. But yesterday you heard that [Winfred] came from the Philippines. And you heard that he was an engineer there. . . . And you heard that he worked hard. And you heard that he chose Las Vegas as a place to go because he was living the American Dream.

"And we only wish that was the case for [Winfred] because . . . there were other reasons why he went to Las Vegas. And these are the reasons:

"No. 1, he was married to another woman in Las Vegas. He had obtained, or said to this other woman, Rosalinda [V.], that he was divorced, and obtained a Mexican divorce. But in reality, [Winfred] was not divorced. He was married to the woman that's seated in this courtroom. And I'm sorry I have to say this in front of you ma'am. That's one of the reasons.

"Another one of the reasons is that he has two children from another woman in Las Vegas. And so when you say that [Winfred] was going to Las Vegas to live the American Dream, he was going there in a sense to live the American nightmare.

"And when you hear that [Winfred] was just doing this because he wanted to improve his family, going back and forth to Las Vegas twice a week, staying over the weekend, in fact, for a period of time, he had another wife, he has two other children. He supports them. Unfortunately, [Celinia] found out about this during the course of this case, which I'm sad to hear, sad to say.

"At any rate, for whatever reason, [Winfred] decided Las Vegas was the place to be. [¶] . . . [¶]

"The evidence will show that [Winfred] claims poor memory. [Winfred] said he didn't remember the woman that he married in Las Vegas, until he was shown evidence, and then he remembered. [H]e testified under oath that he didn't remember that he had two kids from another woman in Las Vegas, until he was shown. And [Winfred] wants to forget he forgets."

With opening statements concluded, Winfred testified briefly and then called a medical expert and an expert on tire defects, among other witnesses. Winfred said he could not remember anything about the morning of the accident or how the accident occurred. But he knew that the weight of the loaded produce could not exceed 2,000 pounds. On cross-examination, Yukevich asked Winfred, "[I]s it correct, sir, to say that the more you were able to put in the van to take to Las Vegas, the more money you would make?" Winfred replied in the negative, saying that overloading the van would subject him to a fine of over $300 and, because the accident occurred in August, when the temperature in Las Vegas was "too hot," any extra vegetables would require him to sleep in the van and run the air conditioner all night. Consequently, he said, "[i]t will be a waste to buy. Instead of making money, you will not make money." Winfred stated he had been engaged in the delivery business for 20 years, and he tried to load only 2,000 pounds or less. His customers in Las Vegas placed orders for a specific number of pounds of produce, and he purchased produce in Los Angeles—by weight—so as not to exceed 2,000 pounds. He depended on the markets in Los Angeles to determine the weight of what was being bought and loaded. Generally, the produce was contained in boxes, which were placed on top of a pallet in the van. The boxes were stacked, leaving about one to two feet of empty space between the produce and the van's ceiling. In response to a question from a juror, the trial court asked, "Things that have happened recently, you have trouble remembering, but things that happened a long time

ago, you can remember those things. Do you agree with that?" Winfred said, "I agree I can remember some, but not every one, Your Honor."

Dr. Feuerman testified as Winfred's medical expert, explaining the history of Winfred's brain injury, his treatment, and the resulting effects on his cognitive abilities, including his memory problems. Dr. Feuerman stated that Winfred was not malingering—not faking his cognitive deficits.

David Osborne was Winfred's tire expert. Osborne testified that the Michelin tire was defective, in part, because it did not contain a "nylon cap ply," that is, a layer of nylon wrapped around the tire on the top of the two layers of steel cords. In his opinion, the tire would not have failed if Michelin had put a nylon cap ply on it. In addition, the tire had adhesion defects that caused tread separation: The "inner rubber liner" was not properly bonded to the "polyester carcass," and the "lower steel belt" was not properly bonded to the rubber cushion strip that goes between the belt and the polyester carcass. Finally, Osborne did not find any of the telltale signs of a tire that has failed due to overloading the vehicle.

Winfred's eldest son John, who was 34 at the time of trial, testified he worked in his father's transport business from 1986 to 1992, going with him to Las Vegas every other week. John's primary task was loading and unloading the van. At the beginning of that period, Winfred used a van he owned. Later, he started renting vans from Enterprise Rent-A-Car. Winfred purchased the produce by the pound. Either the weight was written on the box or the markets weighed the produce. The merchants in Los Angeles had no incentive to provide "extra poundage" because Winfred would pay only for the number of pounds he ordered. John testified that his father always checked the tire pressure before and after the van was loaded. Winfred also checked the oil level and air-conditioning coolant before each trip and took the van to a mechanic for routine maintenance, such as rotation of the tires. Winfred always made sure he could see through the rear window.

On cross-examination, one of Yukevich's first questions was whether John thought his father was telling the truth about "what was happening in his life at that time." An objection was made, and the trial court told Yukevich to repeat or rephrase the question. The "rephrased" question was whether Winfred had ever said that the van's tires were "bulging out." John answered in the negative. The trial court asked, "Didn't your dad start in 1992 . . . to spend a lot more time in Las Vegas?" John said his father "spent as much time in Las Vegas as he did before." On redirect, John testified that his father's "recollection" of events before the accident "is not good."

Beginning in the summer of 2003, Winfred was assisted by Anthony Smith, who operated a tractor-trailer rig, or "18 wheeler." Smith would pick

up produce in the Los Angeles markets, place it in his truck on Mondays and Thursdays of every week, and meet Winfred on Tuesdays and Fridays at a designated location in Las Vegas. Smith would transport the "excess" produce that Winfred could not carry in his van. The two men did not see one another in Los Angeles. Smith typically transported two, sometimes three, pallets of produce. Each pallet was stacked five to six boxes high and weighed from 1200 to 1500 pounds. When they met in Las Vegas, Winfred's van was empty; he had already delivered the produce he transported. Most of the time, Winfred paid Smith $65 per pallet. The produce in Smith's truck would be transferred to Winfred's van, which could usually hold about one and one-half pallets. Winfred told Smith that his van had a 2,000-pound payload limit. Smith made sure they never put more than 2,000 pounds in the van because he could be liable "if anything went wrong." They would add up the weight of the produce as they loaded the van. The boxes, when stacked in the van, would come to within six inches to one foot of the ceiling. If some of the produce could not be put in the van, Winfred would leave it behind, make his deliveries, and return for it. On the day of the accident, Smith was en route to Las Vegas with a load of produce for Winfred.

According to an accident reconstructionist called by Winfred, when the tire delaminated, the van most likely rolled over two and three-quarters times and perhaps one more time. Winfred was wearing his seat belt during the accident.

For its part, Michelin presented testimony from an engineer, a tire expert, and witnesses who arrived upon the scene of the accident, among others, but did not call a medical expert who had examined Winfred.

Edward Caufield, a professional engineer who holds a doctorate in theoretical and applied mechanics, loaded an exemplar van in several different ways to determine the weight of the produce on the day of the accident. Based in part on the exterior shape of the van after the accident and "load density" tests, Caufield concluded that Winfred had stacked the produce all the way to the ceiling, exceeding the 2,000-pound limit by approximately 1,420 pounds—a total of 3,420 pounds of produce. That placed 2,560 pounds—the weight of the produce *and* the vehicle—on the right rear tire. Caufield could not say that this weight, or any particular weight, caused the tire to fail. He testified that the van was carrying its maximum payload when the produce reached halfway to—several feet below—the van's ceiling.

During his testimony, Winfred was shown a photograph depicting the way in which Michelin's experts had fully loaded the van—from top to bottom and side to side. He was asked if that was the method he used. Winfred said, "No sir," and explained he left more empty space in the van. His son John

was also shown photographs of a van that Michelin's experts had loaded in the same manner. John testified that, when he traveled with his father, he sometimes drove the van, and it was not loaded to that extent. If it had been, he said, the driver could not have seen out the back window, and "you are going to have a lot of squashed food." John saw the interior of his father's loaded van about two months before the accident. It did not resemble the Michelin photograph then either.

Gary Bolden was Michelin's tire expert. He opined that the right rear tire failed because the van was overloaded, basing his opinion in part on a "fracture" that went completely around the tire just above the wheel rim. Bolden also stated that many of the polyester cords in that area had melted at their tips, which meant that the tire had reached an extremely high temperature indicative of overloading. Bolden performed "step load" tests on the same size, type, and model tire as the one on Winfred's van. During the test, a tire with 35,000 miles on it was run on a dynamometer at 70 miles per hour, and the weight on the tire was increased by 300 pounds every hour. The tire "failed" after it had run a total of 303 miles with a load of 4,530 pounds. Bolden testified that these test results were consistent with Caufield's opinion that the actual tire failed at 2,560 pounds of combined weight from the vehicle and the produce. Yet Bolden had no opinion as to the weight on the right rear tire at the time of the accident or the weight that would have caused the tire to fail.

Officer Brandon Vessels, with the California Highway Patrol, was one of the first officers to arrive at the scene. There were boxes of produce, bags of produce, and loose produce around the outside of the van. Officer Vessels described the interior cargo area of the van as filled with produce, floor to ceiling, front to back, and side to side.

One of the tow truck operators testified that, when pulling the van onto a flatbed, the winch made a straining noise, indicating that the van, including the produce left inside, weighed more than 8,000 pounds; the van itself weighed 4,900 pounds, suggesting the produce weighed more than 3,100 pounds. On cross-examination, the operator admitted that the weight of the van and the produce *plus* any "drag" on the vehicle would affect the sound of the winch; in this instance, drag was created by a bent front right wheel, the delaminated right rear tire, and the failure to put the vehicle in neutral, which left both rear wheels "locked."

After calling its witnesses to the stand, Michelin closed its presentation of evidence with excerpts from Winfred's deposition. Before starting to read from the transcript, Yukevich sought the trial court's permission to add an excerpt—not previously approved by the court—concerning Winfred's financial contributions to his illegitimate sons. Yukevich argued that the proffered

evidence established a motive for Winfred to overload the vehicle, namely, Winfred needed to increase his profits in order to support a second family. Winfred's counsel objected, calling Michelin's argument "despicable" because there was no evidence about the financial condition or expenses of Winfred or the two families; and, in addition, the argument was too attenuated and unduly prejudicial. The trial court responded in this colloquy:

"The Court: [The evidence] does suggest [Winfred] felt an ongoing— which a father should—an ongoing responsibility to support his children.

"[Winfred's counsel]: None of which has any way to prove that he overloaded the van to do it. . . .

"The Court: It's an inference. Mr. Yukevich wants to argue [it is] a reasonable inference from the evidence. There is some evidence that there was some support outgoing, and he felt an ongoing obligation. Therefore, he was attempting to maximize the profits from—the income from all of his labors. [¶] . . . [¶] I think I am going to have to overrule the objections. It is arguably a motive for loading up the van. He has two families to support."

Winfred's deposition excerpts, as read to the jury, included the following. Winfred did not recall or did not know virtually anything about the loading of the vehicle on the day of the accident, although his habit and custom for 20 years had been not to exceed the 2,000-pound maximum payload. He purchased the produce by the pound at the markets in Los Angeles in accordance with the number of pounds ordered by his customers in Las Vegas. In that way, he kept track of the total weight of all the produce. Yukevich asked Winfred if bulging tires on the van would indicate to him that someone had placed too much produce in the vehicle. Winfred explained that because the tires were small, regardless of whether he was carrying 2,000 pounds of produce *or less*, they bulged as if the van were overloaded.

Winfred was asked, "Who is Maria [P.]," and he replied, "I do not recall." Three questions later he was asked, "Was she a manager of your store or restaurant," and he answered, "Yes." Winfred went on to say that she began working for him around 1986, and the store and restaurant closed in 1994. He recalled last seeing Maria in 1994. On July 24 and August 20, 2004, Winfred had written checks to Maria but could not remember if he gave them to her in person or sent them to her through someone else. Yukevich asked, "Maria [P.] has testified that she has given birth to two children by you; is that true?" Winfred answered, "Yes." Yukevich then read into the record the full names and birthdates of both children—a son born in 1993 and another in 1994— from their birth certificates. Winfred identified both certificates. Yukevich asked Winfred if he had provided any financial support for the boys. Winfred

said he "always" gave them money, although he could not remember the amount. The money came out of his earnings from the "delivery business to Las Vegas." The checks to Maria in July and August 2004, totaling $1,000, were to buy a computer for the boys.

Moving on to a different subject, Yukevich asked Winfred if he recognized Rosalinda's name. He said, "Yes," but subsequently said, "No," when asked if he remembered marrying her. Seconds later, Winfred testified that he thought his marriage to Rosalinda had ended by annulment, not divorce. Yukevich elicited testimony to the effect that Winfred had an affair with Rosalinda while she was married to his business partner, Roger V. Winfred was shown a marriage certificate bearing his and Rosalinda's names, with a marriage date of December 31, 1984. Winfred said the document did not refresh his memory that he married Rosalinda on that day. He was then shown a divorce complaint filed in Nevada by "Winfred [D.]" against "Rosalinda [D.]" Yukevich asked if the complaint refreshed Winfred's memory that he filed for divorce in 1988. Winfred repeated his belief that his marriage to Rosalinda had ended by annulment, not divorce. He said Rosalinda had come to his store and "ma[d]e a scene," so he told her to seek an annulment. Yukevich concluded Winfred's deposition testimony by referring to portions of the divorce complaint and asking him whether they were true. In response, Winfred repeated that he could not remember if he married Rosalinda on December 31, 1984.

After reading from Winfred's deposition, the defense rested. The various exhibits—marriage certificate, marriage license, divorce complaint, decree of divorce, and birth certificates—were admitted into evidence.

The parties presented closing arguments. In his closing, Yukevich asserted that if Winfred could "load another 1250, another 2500 pounds into his van," he would make more money. "And it is, in part, reason why the evidence of [Winfred's] having children and a family in Las Vegas is relevant."

Yukevich continued: "Because [Winfred] . . . in his deposition did not tell us the truth when [he] testified, he was asked a variety of questions about why he went to Las Vegas. He was asked a variety of questions about the issue of who . . . Maria [P.] was. First he said he didn't know. Then he said, 'She worked in my store.'

"Then after we obtained birth certificates, . . . finally he admitted it. That is the way . . . to consider the testimony in this case.

"[Winfred], God bless him, he had a serious injury. . . . [Winfred] cannot be trusted, at least initially, because he wasn't truthful in his own deposition. He gave testimony under oath which is false and incorrect.

"And when you give testimony in a lawsuit and you don't tell the truth, the jury has a right to know that. [Am I] saying this because I get any enjoyment out of talking about anybody's personal life? Absolutely not. Absolutely not. And am I doing it dirty [to] the plaintiff? No."

Later in his closing, Yukevich said: "We're going to talk about whether you can believe the testimony that you heard from [Winfred]. And I'm going to tell you that there are a couple of documents, that if you wish to review them, you can. . . . The documents which were marked in evidence, which is the marriage license. And [Winfred], in 1984, . . . remember, that he had a disagreement with his partner, [Roger V.], . . . and in 1984 they dissolved the business.

"Well, you will see from the marriage license that what happened was that [Winfred] married [Roger V.'s] wife in Las Vegas while he was married to [Celinia]. He stated under oath that he had been divorced in June of 1983 in Mexico. And then went on New Year's Eve of 1984 . . . with a woman named Rosalinda [V.], and he married her. And he was married to her in Las Vegas for six years.

"And all of the marriage certificates, the summons, and the complaint for divorce—now, this is all while he was married to his present wife, he married someone else.

"And what you will find when you look at these records is that [Winfred] was capable, in his deposition, of identifying all of the things about where the [sausage] plant was, all of the things about what happened with [Roger V.] He just conveniently forgot that he had married [Roger's] wife. And that's something that you can consider with respect to the credibility of [Winfred]. And he gets up there and says, I remember what happened, 2,000 pounds. You can take a look at his testimony, how it was that he expressed it, the fact that he can't remember things that are harmful [to] him, but he can remember things that are helpful to him. [¶] . . . [¶]

"[Exhibits 598 and 599 have] to do with the two children in Las Vegas which we believe shows that [Winfred] had [an] incentive to load this van as much as he could because all of the money that he earned in this grocery business, that's where the kids and the mom in Vegas got paid from. It's as simple as that."

On August 16, 2006, the jury was instructed and commenced deliberations. On August 18, 2006, the jury returned a special verdict in Michelin's favor, voting 12 to zero as to a manufacturing defect and 11 to one as to a design defect. Judgment was entered accordingly, and notice thereof was served on the parties. Winfred appealed.

## II

## DISCUSSION

██ "No evidence is admissible except relevant evidence." (§ 350.) "Relevant evidence" means "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) Although proffered evidence may have some relevance, "[t]he [trial] court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) We review a trial court's evidentiary rulings for an abuse of discretion. (See *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 358 [48 Cal.Rptr.3d 875]; *People v. Geier* (2007) 41 Cal.4th 555, 584–585 [61 Cal.Rptr.3d 580, 161 P.3d 104].)

██ "Ordinarily, evidence of marital infidelity would be inadmissible on grounds that it lacks relevance and amounts to a 'smear' upon the [witness's] character" (*Smith v. Com.* (Ky. 1995) 904 S.W.2d 220, 222), and "its inflammatory nature far outweigh[s] any probative value" (*Barnett v. Com.* (Ky. 1988) 763 S.W.2d 119, 124; see *Alejo Jimenez v. Heyliger* (D.P.R. 1992) 792 F.Supp. 910, 919–920; *Barnett v. State* (Tex.App. 1987) 733 S.W.2d 342, 345; *Wood v. State of Alaska* (9th Cir. 1992) 957 F.2d 1544, 1545–1546, 1549–1554, modified on another point in *U.S. v. Larson* (9th Cir. 2007) 495 F.3d 1094, 1100–1101). On the other hand, an extramarital affair may be admissible where it has a connection to a substantive issue and goes to motive. (See *Bratcher v. Com.* (Ky. 2004) 151 S.W.3d 332, 350.) For example, " ' "upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show [motive.]" ' " (*People v. Houston* (2005) 130 Cal.App.4th 279, 307 [29 Cal.Rptr.3d 818], quoting *People v. Gosden* (1936) 6 Cal.2d 14, 25 [56 P.2d 211].) And where a husband sues for the wrongful death of his wife, evidence of his extramarital affairs is admissible to show "the nature of the personal relationship [with his wife] and thus . . . whether there was any loss of love, companionship, comfort, affection, society, solace, moral support or enjoyment of sexual relations." (*Morales v. Superior Court* (1979) 99 Cal.App.3d 283, 288 [160 Cal.Rptr. 194].)

Here, the substantive issue was whether Winfred's vehicular accident was caused by a tire defect, as he asserted, or by overloading the van with produce, as Michelin contended. The trial court admitted evidence that Winfred was married to Rosalinda while he was also married to Celinia, he had an extramarital affair with Maria after divorcing Rosalinda, and he had two sons by Maria. The trial court concluded that (1) Winfred's opening statement "opened the door" to this evidence; (2) the evidence was admissible on the issue of Winfred's credibility; (3) the evidence showed that Winfred's brain injury was not as serious as he claimed; and (4) evidence that Winfred had a family in Las Vegas permitted an inference that he overloaded the van in order to make enough money to support two families. We conclude that none of these reasons supported the admission of the disputed evidence, resulting in a miscarriage of justice. We therefore reverse for a new trial.

## A.  *Opening Statement*

Consistent with the position of the parties, we assume for purposes of appeal that an opening statement may, in some circumstances, open the door to otherwise inadmissible evidence. Nevertheless, we acknowledge a strong argument may be made that the "open the door" theory of admissibility should not apply to opening statements.

In many federal courts " 'a party who raises *a subject* in an opening statement "opens the door" to [the] admission of evidence on that *same subject* by the opposing party.' " (*U.S. v. Magallanez* (10th Cir. 2005) 408 F.3d 672, 678, italics added; accord, *U.S. v. Segal* (9th Cir. 1988) 852 F.2d 1152, 1155–1156; *U.S. v. Chavez* (10th Cir. 2000) 229 F.3d 946, 952 [citing cases]; Jones et al., Federal Civil Trials and Evidence (The Rutter Group 2008) ¶ 6:103, p. 6-13 (rev. # 1, 2005).)

In contrast, several state courts have held that, because an opening statement is mere argument and has no evidentiary value, it does not open the door to otherwise inadmissible evidence. (See, e.g., *State v. Trotter* (2001) 262 Neb. 443, 453–455 [632 N.W.2d 325, 335–336]; *State v. Anastasia* (2003) 356 N.J.Super. 534, 542 [813 A.2d 601, 606]; *Cooper v. Com.* (2000) 31 Va.App. 643, 650 [525 S.E.2d 72, 75]; *State v. Richards* (1993) 190 W.Va. 299, 302–303 [438 S.E.2d 331, 334–335].) The state courts have reasoned that "[i]f improper remarks are made by counsel, the remedy lies in a curative instruction to the jury or, if absolutely necessary, a mistrial." (*State v. Anastasia, supra*, 813 A.2d at p. 606.) The introduction of "actual evidence," not comments by counsel, determines the scope of rebuttal evidence. (See *State v. Richards, supra*, 438 S.E.2d at p. 335; *State v. Trotter, supra*, 632 N.W.2d at p. 336.)

In California, one court has addressed the issue. In *Rufo v. Simpson* (2001) 86 Cal.App.4th 573 [103 Cal.Rptr.2d 492], the Court of Appeal held that a reference in the defendant's opening statement to his willingness to take a lie detector test did not permit the plaintiff to inquire into that subject where the plaintiff failed to object to the opening statement. The court emphasized that an opening statement is not evidence and that any error had been cured by an admonition to the jury to disregard plaintiff's questions about the lie detector test. (*Id.* at pp. 600–604; see 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 352, pp. 439–440 ["open the door" argument is a "popular fallacy" and turns on whether *evidence* has been admitted by adversary that is prejudicial and not curable by objection or motion to strike].)

Winfred's opening statement mentioned the American Dream and described his biographical and business background. In the late 1980's, Winfred started the transport business he was still operating on the day of the accident. The trial judge faulted the opening statement for referring to the American Dream, appealing to the sympathy of the jury, and concealing an additional reason for Winfred's trips to Las Vegas—to see his mistress and illegitimate children. The court also commented that the evidence of Winfred's illicit conduct "can be explained."

By definition, the "American Dream" is "an American social ideal that stresses egalitarianism and . . . material prosperity." (Merriam Webster's Collegiate Dict. (10th ed. 1995) p. 37, col. 1; accord, Random House Merriam Webster's College Dict. (1992) p. 44, col. 2.) We fail to see how the use of this term—or any other language in the opening statement—was inappropriate or played on the jury's emotions. Counsel simply told the jury what Winfred had done in attempting to achieve material prosperity. From any objective perspective, Winfred *was* pursuing the American Dream: He was a successful small business owner for 20 years.

Nor do we understand how Winfred's opening statement permitted Michelin to discuss his *private* reasons for traveling to Las Vegas. The opening statement focused solely on Winfred's *business* pursuits. He rented the van to transport produce to Las Vegas. Further, he started his transport business in the 1980's, long before his "Las Vegas family" existed. And Michelin's explanation for the accident focused on the business purpose of the trip—the van was allegedly overloaded with produce—not on Winfred's desire to visit Maria and the children. The sum and substance of Winfred's opening statement—his pursuit of the American Dream through various business ventures—did not include the *same subject* on which Michelin sought to introduce evidence—his illicit, intimate conduct. (See *U.S. v. Magallanez, supra*, 408 F.3d at p. 678; *U.S. v. Segal, supra*, 852 F.2d at pp. 1155–1156.)

Consequently, the trial court erred by rejecting Winfred's section 352 objection and by ruling that, as to Winfred's illicit activities, "let's let it all come out." (Cf. *State v. Peterson* (2006) 179 N.C.App. 437, 442, 461–464 [634 S.E.2d 594, 601, 612–614] [in murder prosecution, where opening statement portrayed defendant's relationship with his murdered wife as happy and loving, trial court properly admitted evidence of defendant's attempts to have extramarital sex].)

Finally, in rejecting Winfred's argument that the evidence was more prejudicial than probative, the trial court stated that the evidence could be "explained." But how could a party "explain" an extramarital affair in a way that rehabilitates his or her credibility? Once the evidence is "out," the harm is done and irreparable. To bring up the subject again—in an attempt to somehow "explain" it—a party would simply remind the jury of the illicit behavior and probably do more harm than good. For all of these reasons, the evidence of Winfred's private life should not have been received.

## B. *Credibility*

Michelin's primary basis for introducing evidence of Winfred's illicit conduct was to contradict his deposition testimony that he could not recall who Rosalinda and Maria were. But his extramarital affairs were irrelevant to the substantive issue in the case: the cause of the accident. To the extent the evidence was relevant to Winfred's credibility, it was more prejudicial than probative. It follows that the trial court abused its discretion by overruling Winfred's section 352 objection.

In *People v. Lavergne* (1971) 4 Cal.3d 735 [94 Cal.Rptr. 405, 484 P.2d 77] (*Lavergne*), the defense asked a prosecution witness and accomplice whether the car used to commit a robbery had been stolen. The witness said it was not. The defense then sought to impeach the witness with testimony from the owner of the vehicle. The prosecution objected, and the trial court sustained the objection. The Supreme Court affirmed, noting: "While collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury. The Law Revision Commission notes, in its comment on section 780, that the inflexible rule excluding collateral matters relevant to credibility has been eliminated, but goes on to state that not all evidence of a collateral nature offered to attack the credibility of a witness is thereby made admissible. It refers to the trial court's 'substantial discretion' under section 352 to exclude prejudicial and time-consuming evidence. It concludes that the effect of section 780, when read with section

352, is 'to change the [then] present somewhat inflexible rule of exclusion to a rule of discretion to be exercised by the trial judge.'[2]

"California courts have, in cases similar to this one, held the court's exclusion of collateral facts offered for impeachment purposes to be a proper exercise of the trial judge's discretion. In *People v. Atchley* [(1959)] 53 Cal.2d 160 [346 P.2d 764][, cert. dism. (1961) 366 U.S. 207 [6 L.Ed.2d 233, 81 S.Ct. 1051]], defendant was on trial for the murder of his wife. Defendant attempted to impeach a prosecution witness by showing that she had forged rent receipts for the deceased to deceive the welfare department after she testified on cross-examination that she never forged a rent receipt. That case, like this one, involved an attempted impeachment of a prosecution witness on a collateral matter involving a crime with which the witness was neither charged nor convicted. In that case we held that the trial court had discretion to foreclose further inquiry into the forgery issue, even for purposes of impeachment. . . . That case would seem to govern here.

"Two additional factors tend to support the judge's exercise of discretion in the instant case. A witness may have a strong reason to lie about the collateral fact which reason would furnish no motive to lie in his other testimony. Where such a situation exists, the possible inference that a witness false in part of his testimony is not to be trusted as to other parts is weakened. . . .

"Secondly, it appears that the defendant, on cross-examination, purposely elicited the testimony for the very purpose of impeaching the witness. . . . A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted. . . . This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions." (*Lavergne, supra,* 4 Cal.3d at pp. 742–744, fn. & citations omitted.)

In *Mendez v. Superior Court* (1988) 206 Cal.App.3d 557 [253 Cal.Rptr. 731] (*Mendez*), the plaintiff sued her employer, the County of Merced, and Robert Mendez, a fellow employee and deputy in the Merced County Sheriff's Department, alleging that Mendez had sexually assaulted her. The plaintiff's husband brought a claim for loss of consortium but dismissed it during discovery. When the plaintiff was deposed, she was asked if, after her marriage, she had " 'participated in any sexual relationship with anyone?' "

---

[2] Section 780 states that the jury may consider any matter bearing on the truthfulness of a witness's testimony, including "[h]is demeanor while testifying . . ."; "[t]he extent of his capacity to perceive, to recollect, or to communicate . . ."; "[h]is character for honesty or veracity or their opposites"; and "[a] statement made by him that is inconsistent with any part of his testimony at the hearing." (*Id.,* subds. (a), (c), (e), (h).)

(*Id.* at p. 562.) She answered, "No." (*Ibid.*) The defendants had already obtained deposition testimony from others indicating that the plaintiff had engaged in extramarital affairs, including one with a sergeant in the department.

The plaintiff brought an in limine motion to exclude evidence of her sexual conduct with anyone other than Mendez. The defendants countered with a motion to discover additional evidence of the plaintiff's infidelity. The trial court granted the plaintiff's motion and denied the defendants' motion. Defendants filed a petition for a writ of mandate.

The Court of Appeal denied the petition, stating: "[D]efendants maintain plaintiff's sexual history bears upon her credibility. Although finely framed, County's argument appears to assert, and conclude, that sexually-active people may be less credible than more chaste individuals. Taken to its natural conclusion, if such an interpretation has substance, then County's claim of relevance would arguably justify discovery of the sexual practices of all potential witnesses. In order to accept the legitimacy of the deposition inquiries as to [the plaintiff's] other sexual activities on the grounds asserted by County, the basic proposition must be accepted that promiscuity has a bearing on one's veracity.

". . . County furnishes no support for the thinly veiled proposition that promiscuity engenders prevarication other than speculation and innuendo. The argument is predicated upon a perception and stereotype that has neither a basis in experience nor proof. Common perceptions do not rise to the level of truth simply because of repetition or general regard. . . .

"Mendez argues that evidence of plaintiff's alleged extramarital affairs will be potentially admissible to assail her *denial* under oath, at [*her*] *deposition*, of having engaged in extramarital conduct. In addressing this argument, Mendez notes that at the time of the deposition inquiry, plaintiff's husband had alleged a cause of action for loss of consortium. Assuming, arguendo, that the line of inquiry might have had some relevance on that issue, that cause of action was dropped [before] the trial court's order herein. Therefore, any relevancy the information might have had to the cause of action disappeared with the cause of action.

"Mendez asserts that plaintiff's denials coupled with contradictory evidence from other witnesses constitutes specific facts supporting the relevance of the evidence as to plaintiff's credibility. Mendez contends plaintiff was untruthful in her denials and that discovery of impeaching evidence is proper to attack her veracity. Mendez, however, overlooks several issues.

"As the consortium cause of action was dropped, any remaining relevancy must be predicated upon its impact on credibility. . . . [¶] . . . [¶]

"[And the] probative value of the sought-after information is a substantial consideration. [One authority] provides an excellent yardstick for a determination of the issue of materiality and probative value: 'This involves the strength of the relationship between the evidence and inferences derived therefrom and the issue upon which the evidence is offered, and whether such evidence tends to prove a *main issue* or a *collateral matter.* If proffered evidence affords strong inferences on a main issue in a case, its probative value is substantial. If the evidence affords only weak inferences of fact on a major issue, its probative value is obviously weak or slight. Also, if such evidence tends to prove some collateral, disputed issue, such as impeachment of a witness on a collateral matter, its probative value is less than that of evidence offering substantial proof of a main issue.' . . .

"As we have noted, proof as to plaintiff's alleged extramarital affairs could not, being irrelevant directly on the issue of credibility, have been independently shown on that issue. However, questions were asked and denials given. Absent the existence of a contradictory statement, . . . the line of inquiry is irrelevant. Thus, the question and the contradictory proof are, at best, collateral. [¶] . . . [¶]

". . . We have already determined that the line of inquiry has become inappropriate. Mendez's and County's position would imply that the existence of an inconsistent statement is admissible to attack credibility. However, there must be a statement to attack. If the statement to be impeached is not admissible then the impeachment of it is not permissible. . . . [And] specific instances of conduct relevant only to prove 'a trait of his character [are] inadmissible to attack or support the credibility of a witness.' . . ." (*Mendez, supra,* 206 Cal.App.3d at pp. 575–577, 1st & 2d italics added, citations omitted.)

Similarly, in *Devine v. Devine* (1963) 213 Cal.App.2d 549 [29 Cal.Rptr. 132] (*Devine*), a final decree of divorce gave the father visitation rights and obligated him to make support payments. The father filed an order to show cause seeking greater visitation rights. The mother filed an order to show cause requesting a termination of his visitation rights and an increase in child support. At the hearing, the trial court allowed the father to be questioned about alleged "sexual misconduct" with the mother that supposedly occurred *before* they separated. The father denied the charges. The trial court permitted this evidence to remain in the record for impeachment purposes, although the court properly ruled that the evidence was immaterial to the substantive issues. The mother testified that the father had engaged in "sexual misconduct." The trial court also ruled that the mother's testimony was not relevant to the substance of the dispute but would be considered for impeachment. Ultimately, the trial court issued an order terminating the father's visitation rights and increasing the amount of child support.

The Court of Appeal reversed, pointing out that "[i]n the first place, the testimony in question was obviously on a collateral and irrelevant matter. Such testimony may not be used for impeachment. . . . Further, '[a] party cannot cross-examine his adversary's witness upon irrelevant matters, for the purpose of eliciting something to be contradicted.' . . . Third, ' ". . . if a question is put to a witness on cross-examination which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked him the question . . ." . . . .' " (*Devine, supra*, 213 Cal.App.2d at p. 554, citations omitted; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1248 [120 Cal.Rptr.2d 432, 47 P.3d 225] [party should not be allowed to introduce prejudicial evidence in response to obvious mistake by adversary in giving irrelevant testimony]; *id.* at pp. 1271–1272 (conc. opn. of George, C. J.) [party's failure to object to improper questions asked of adversary does not allow party to elicit immaterial or irrelevant testimony]; 3 Witkin, Cal. Evidence, *supra*, Presentation at Trial, §§ 341–342, 346, 352, pp. 426–427, 432–433, 439–440 [if party makes mistake of introducing irrelevant evidence that is not prejudicial—or, if prejudicial, that may be cured by objection, motion to strike, or admonition to jury—adversary should not be permitted to capitalize on mistake by offering impeaching evidence on collateral matter].)

In *Devine*, the Court of Appeal also concluded that a new trial was required, stating: "In light of the judge's ultimate orders in this case, it seems highly probable that she concluded from this erroneously admitted evidence (which she considered properly before her for impeachment) that [the father] was thoroughly unreliable, and that she was therefore justified in disbelieving, and apparently did disbelieve, his testimony with reference to matters touching upon his right of visitation, and with respect to his income and living expenses and consequent financial ability to pay increased child support. . . . [T]he error in question becomes not only serious but prejudicial for it has the effect of depriving him of a fair trial." (*Devine, supra*, 213 Cal.App.2d at pp. 554–555.)

Finally, case law indicates that evidence of a plaintiff's infidelity "involves not only [*his*] right to privacy, but the privacy of uninterested third persons. Insofar as defendants seek to pry into plaintiff's sexual conduct with others, they necessarily seek to pry into the third party's sexual conduct. . . . While theoretically such third parties could seek to appear in this action and oppose defendants' [efforts] . . . , such [privacy protection] under these circumstances is meaningless; first and foremost, what is sought by defendants is the right to ferret out the existence and identity of such third parties." (*Mendez, supra*, 206 Cal.App.3d at p. 568, citations omitted; accord, *Morales v. Superior Court, supra*, 99 Cal.App.3d at pp. 291–292 [husband suing for wrongful death of

wife must disclose his extramarital affairs in answering defendants' interrogatories but, to protect third party rights, he is not to provide information identifying women involved].)

We now describe in more detail the nature of the evidence in dispute. Yukevich informed the jury in opening statement, during the presentation of evidence, or in closing argument: (1) while Winfred was married to Celinia, whom he married in 1970, he was also married to Rosalinda from 1984 to 1988; (2) Rosalinda was the wife of Winfred's business partner, Roger, when Winfred began to have an affair with her; (3) Winfred deceived Rosalinda before marrying her, showing her a worthless Mexican divorce decree purporting to dissolve his marriage to Celinia; (4) after Winfred divorced Rosalinda in 1988, he had an extramarital affair with Maria; (5) he and Maria had two sons.

■ Because this evidence has no tendency to prove or disprove any disputed fact concerning the cause of Winfred's accident, its use is necessarily limited to impeachment. (See *Mendez, supra,* 206 Cal.App.3d at pp. 575–577.) Just as evidence of a woman's unchaste behavior is no longer admissible on the issue of credibility unless it tends to show bias—for example, if she had an intimate relationship with a party or witness (see *United States v. Kasto* (8th Cir. 1978) 584 F.2d 268, 271–272 & fns. 2, 3; *People v. Sweeney* (1960) 55 Cal.2d 27, 33–34, 39–44 [9 Cal.Rptr. 793, 357 P.2d 1049])—neither is evidence of a man's sexual conduct (see *Devine, supra,* 213 Cal.App.2d at pp. 553–554; *U.S. v. Eagle* (8th Cir. 2007) 498 F.3d 885, 889–890). Further, a "witness may have a strong reason to lie about [illicit, intimate relationships]" (*Lavergne, supra,* 4 Cal.3d at p. 743), such that he "may not [be] cross-examine[d] . . . upon [that] collateral matter[] for the purpose of eliciting something to be contradicted" (*id.* at p. 744). Accordingly, Winfred's denial of his extramarital affairs at his deposition may not be contradicted at trial because the denial itself is irrelevant and prejudicial and thus inadmissible. (See *Mendez, supra,* 206 Cal.App.3d at pp. 575–577; *Lavergne, supra,* 4 Cal.3d at p. 744.) In short, the *existence* of irrelevant deposition testimony by a witness does not permit its *introduction* by an adversary just so the adversary can then offer contradictory evidence to impeach the witness. (See *People v. Steele, supra,* 27 Cal.4th at p. 1248; *id.* at pp. 1271–1272 (conc. opn. of George, C. J.); 3 Witkin, Cal. Evidence, *supra,* Presentation at Trial, §§ 341–342, 346, 352, pp. 426–427, 432–433, 439–440.)

These principles are of particular importance if the proffered evidence involves an issue of sexual conduct, and its admission is highly prejudicial and inflammatory. (See *Devine, supra,* 213 Cal.App.2d at pp. 554–555; *Wood v. State of Alaska, supra,* 957 F.2d at pp. 1551–1553; *Kvasnikoff v. State*

(Alaska Ct.App. 1983) 674 P.2d 302, 305–306; *Smith v. Com., supra*, 904 S.W.2d at p. 222; *Barnett v. Com., supra*, 763 S.W.2d at p. 124; *Alejo Jimenez v. Heyliger, supra*, 792 F.Supp. at pp. 919–920; *Barnett v. State, supra*, 733 S.W.2d at p. 345.)

■ In addition, where the irrelevant evidence implicates the privacy concerns and reputations of nonparties, the trial court must consider the effect of admissibility on them. (See *Mendez, supra*, 206 Cal.App.3d at p. 568; *Morales v. Superior Court, supra*, 99 Cal.App.3d at pp. 291–292.) Here, the record contains numerous references to the full names of Winfred's second wife and his subsequent mistress, exposing them to possible public ridicule and doubts about their character. Both were deposed by Michelin and questioned about their relationship with Winfred, subjecting them to unnecessary embarrassment. (See *B.J.R.L. v. State of Utah* (D.Utah 1987) 655 F.Supp. 692, 693–694, 697–699; *S.M. v. J.K.* (9th Cir. 2001) 262 F.3d 914, 919, amended (9th Cir. 2003) 315 F.3d 1058.) Perhaps more disturbing was Michelin's disclosure of the full names and birthdates of Winfred's two illegitimate children—which were read into the record—as well as the admission into evidence of their birth certificates; the use of this evidence was even more questionable given that Winfred had already testified that he and his mistress had two children. (See *B.J.R.L. v. State of Utah, supra*, 655 F.Supp. at pp. 693–694, 697–699; *Southern Methodist University Ass'n v. Wynne & Jaffe* (5th Cir. 1979) 599 F.2d 707, 712–713; *Heather K. by Anita K. v. City of Mallard, Iowa* (N.D.Iowa 1995) 887 F.Supp. 1249, 1255–1256.)

In sum, the trial court abused its discretion in concluding that the evidence of Winfred's illicit activities was more probative than prejudicial under section 352.

## C. *Winfred's Brain Injury*

Michelin argues that questions about Winfred's private conduct were permitted to prove that his memory was not as poor as he claimed. In other words, Michelin could ask Winfred about the intimate details of his private life, wait for him to claim a lack of recall, and then prove he had engaged in the illicit conduct he said he could not remember. There are several problems with this argument.

First, as stated, our Supreme Court has recognized that witnesses have a "strong reason" to lie about an irrelevant or collateral matter, which suggests that the matter should not be used for impeachment. (See *Lavergne, supra*, 4

Cal.3d at p. 743.) And where the irrelevant matter involves the witness's illicit, intimate conduct, there is a greater probability that the witness will lie. *Lavergne*—which precluded questions about the theft of a car—indicates that Michelin should not have been allowed to inquire into Winfred's private life. "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted." (*Lavergne*, at p. 744.) As a result, Michelin could not turn the trial into a game of "gotcha."

■ Second, in a personal injury case where a plaintiff has a partial loss of memory due to brain damage, the defendant cannot ask the plaintiff what he recalls about illicit aspects of his private life that have no bearing on the cause of the accident or bias and are irrelevant and prejudicial. Here, for example, Yukevich told the jury that Winfred "can't remember things that are harmful [to] him, but he can remember things that are helpful to him." Yet the "harmful things" to which Yukevich referred were the illicit activities in Winfred's private life, not acts, events, or conversations related to the cause of the accident or bias. It is one thing to impeach a witness with respect to mistaken or knowingly false answers that are relevant to substantive issues but something else entirely to "test" the witness's memory on private or intimate subjects. Does Michelin contend that the defense in an auto accident case could ask a brain-damaged plaintiff if he had ever smoked marijuana, beaten his wife, or cheated on a test in college? And if the plaintiff said he could not recall, could the defense offer testimony that the plaintiff had once smoked "pot," introduce photographs taken in a domestic dispute investigation showing the wife's bruised face, or call a college professor to the stand? We think not. Rather, if the defense wants to prove that a brain-damaged plaintiff is being deliberately selective about what he supposedly remembers, the "harmful things" must relate to substantive issues or bias, not irrelevant private matters. Otherwise, the defense could conduct an endless fishing expedition in an attempt to discover the plaintiff's most humiliating and damaging intimate conduct. Nor was bias an issue in this case; Rosalinda and Maria did not testify at trial.

Finally, the issue of Winfred's memory problem is essentially a medical one. In opposing Winfred's in limine motion, Michelin relied in large part on the deposition testimony of Dr. Merikangas that, in his opinion, Winfred had lied when he said he could not remember who Maria was. At trial, Winfred called Dr. Feuerman to explain his cognitive deficits. Michelin did not call Dr. Merikangas or another medical expert nor use a medical expert's deposition concerning Winfred's memory. Such evidence might have been an appropriate way to seek to impeach Winfred when he said he could not remember various facts about the accident.

We are struck by the somewhat bizarre nature of Winfred's answers to questions about his private conduct. For example, he said he recognized Rosalinda's name but did not recall marrying her. A few seconds later, however, he said his marriage to Rosalinda was terminated by annulment, without any acknowledgment he had just denied knowledge of the marriage. Similarly, he said he did not remember who Maria was but immediately began to describe his professional and personal relationship with her, including the births of their children. Winfred's medical expert testified at trial that Winfred was not faking his memory problems. Michelin offered no evidence to the contrary. Yet the jury was allowed to speculate, in light of the impeachment evidence erroneously admitted, that Winfred was lying about overloading the van.

Thus, evidence of illicit, intimate conduct is not appropriate on the issue of credibility—absent a connection that shows bias—regardless of whether the plaintiff claims to have suffered an injury that affects his memory.

D.  *Winfred's Motive to Overload the Van*

We have saved Michelin's most tenuous contention for last: Winfred's relationship with Maria and their children provided *the* motive for Winfred to overload the van with produce. This theory was premised on the trial court's conclusion that Winfred "has two families to support."

Where the record in a case refers to the amounts of money spent, evidence that a defendant supported a mistress and frequently gambled may be admissible to prove that his financial condition led him to commit tax fraud (*U.S. v. Hart* (6th Cir. 1995) 70 F.3d 854, 857, 860–861 & fn. 8) or a robbery (*State v. Kim* (2006) 153 N.H. 322, 325, 327–328 [897 A.2d 968, 971, 973–974]).

But here the financial evidence was virtually nonexistent. Winfred gave Maria $1,000 to buy the boys a computer, and although Winfred admitted he "always" gave money to the boys, no evidence was offered as to the amount. We do not know anything about the financial condition, income, or expenses of Winfred, Celinia, and their sons (the Los Angeles family) or Maria and her sons (the Las Vegas family). At the time of the accident, Winfred's sons by Celinia were adults (one in his late 20's, the other in his early 30's) and could have been financially independent. There is no evidence that Winfred gave any money to Maria as opposed to the boys. Celinia's financial situation is a

complete unknown. Accordingly, there is no proof that Winfred supported one family, much less two and, if so, in what amounts. It follows that Michelin's motive theory had insufficient evidentiary support and did not provide a basis for the admissibility of Winfred's extramarital affair with Maria or the existence of his illegitimate children.

██ Further, "[w]hile 'lack of money is logically connected with [an act] involving financial gain . . . [t]he trouble is that it would prove too much against too many.' . . . 'Lack of money gives a person an interest in having more. But so does [the] desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, *without more*, is likely to amount to a great deal of unfair prejudice with little probative value.' " (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 102 [13 Cal.Rptr.3d 878], italics added; accord, *People v. Cornwell* (2005) 37 Cal.4th 50, 96 [33 Cal.Rptr.3d 1, 117 P.3d 622].) And "[o]f course, all of us could use more money . . . ." (*Betor v. National Biscuit Co.* (1929) 85 Mont. 481, 487 [280 P. 641, 643].)

In conclusion, none of the disputed evidence should have been admitted. In ruling otherwise, the trial court abused its discretion.

### E. *Prejudicial Effect*

" ' "[N]o judgment shall be set aside, or new trial granted, in any cause, . . . or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." "A miscarriage of justice . . . occurs . . . when it appears reasonably probable that were it not for the error a result more favorable to the appellant could have been obtained." . . . "Prejudice is not presumed and the burden is on the appellant to show its existence." . . .' " (*Taylor v. Varga* (1995) 37 Cal.App.4th 750, 759, fn. 9 [43 Cal.Rptr.2d 904]; see Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; Evid. Code, § 354.)

From start to finish, Michelin painted Winfred as a liar, cheater, woman-izer, and a man of low morals based principally, if not solely, on what we have concluded was inadmissible evidence. Yukevich even interjected the credibility issue into his questioning of Winfred's son John. As a consequence of this ongoing effort, the jury likely discredited Winfred's testimony that, in accordance with his 20-year habit and custom, he placed no more than 2,000 pounds of produce in the van on the day of the accident. His testimony in that regard was supported by John, who described his father's pretrip prepara-tions. Anthony Smith testified, similarly to Winfred, that 2,000 pounds of produce would come to within about one foot of the van's ceiling. And

Winfred had little reason to overload his van because Smith was always one day behind, carrying the excess produce in his 18 wheeler. Further, Winfred's tire expert, Osborne, found no indication on the failed tire that the vehicle had been overloaded but did find evidence that the tire was defective.

Michelin contends its evidence was so overwhelmingly convincing that the evidence of Winfred's illicit conduct could not have affected the verdict. We disagree. To take some examples, Michelin cross-examined Smith, getting him to admit he told Winfred that the van's tires looked like they were bulging too much. But on redirect, Smith said Winfred had discussed the issue with Enterprise Rent-A-Car and was "assured" that the tires were sufficiently inflated. And Winfred testified that the tires were so small, they bulged when he carried *less than* the maximum payload. Second, the witnesses who arrived shortly after the accident agreed that the van was "full" of boxes and produce, but their testimony shed little light on whether the produce weighed more than 2,000 pounds. Winfred's and Smith's testimony was more on point as to the weight. Third, although one of the tow truck operators said that the winch made a straining noise, he admitted that several sources of drag affected the operation of the winch.

As for the experts, Michelin accuses Winfred's tire expert, Osborne, of overlooking a spot of significant damage on the delaminated tire, one which its expert, Bolden, detected. According to Michelin, this "mistake" so undermined Osborne's credibility that any reasonable jury would have disbelieved him. Not so. Although Osborne did not see any melting on the tire in a spot where Bolden found some, Osborne explained that the location of the melting was not relevant to, and did not undermine, his opinion. Similarly, while Caufield testified that the van was overloaded by having 2,560 pounds on the right rear tire, he could not say that the additional weight caused the tire to fail. Caufield also stated that overloading was indicated by the wear and tear on part of the rear suspension system, but Osborne attributed that condition to the rollover of the vehicle. And Michelin's tire expert, Bolden, said the tire failed due to overloading, but he had no opinion as to the weight on the tire when it delaminated—despite test results showing that the same type of tire remained intact until running 303 miles at 70 miles per hour with a load of 4,530 pounds.

As Yukevich stated in closing, Winfred could not recall the facts of his illicit private life, but he said he could remember not to put more than 2,000 pounds of produce in the van. Yukevich argued that, in light of Winfred's failure to recall the name of his mistress—with whom he had two sons and to whom he had recently given $1,000—he could not possibly remember the details of how he ran his business. But perhaps the most prejudicial use of the inadmissible evidence was Michelin's motive argument:

Winfred overloaded the van to make enough money to support two families. Where a party admits doing an act, motive is irrelevant, but where he denies the act—here, overloading a van—motive may prove crucial. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 14 [45 Cal.Rptr.3d 407, 137 P.3d 229]; *State v. Talbert* (Mo.Ct.App. 1975) 524 S.W.2d 58, 60, fn. 1; *State v. Knox* (1945) 236 Iowa 499, 516–517 [18 N.W.2d 716, 724].) Accordingly, Yukevich's arguments affected the central issue in the case: whether the van was overloaded, on the one hand, or whether the tire was defective, on the other.

Michelin contends that the jury verdict establishes a lack of prejudice because it was "not close." (See *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294 [45 Cal.Rptr.2d 10].) But closeness of the verdict is only one of several factors considered in determining whether an error was prejudicial. (See *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655–657, 644–665 [11 Cal.Rptr.3d 809]; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570–571 [34 Cal.Rptr.2d 608, 882 P.2d 298].) Regardless, the trial court's erroneous evidentiary rulings, which permitted Michelin to parade Winfred's illicit, intimate conduct before the jury—smearing his character and inflaming the jury—likely tainted the entire verdict.

Having reviewed the testimony of the parties' experts and the other witnesses as well as the relevant exhibits, it appears reasonably probable that were it not for the trial court's incorrect evidentiary rulings, a result more favorable to Winfred could have been obtained. (See *Taylor v. Varga, supra,* 37 Cal.App.4th at p. 759, fn. 9.) Because Michelin's use of the inadmissible evidence caused a miscarriage of justice, the judgment must be reversed, and the case shall be remanded for a new trial.

In closing, we mention that the federal and state Constitutions protect the right of sexual privacy, including evidence of extramarital affairs, in civil litigation. (See *Morales v. Superior Court, supra,* 99 Cal.App.3d at pp. 289–290; *Boler v. Superior Court* (1987) 201 Cal.App.3d 467, 473–475 [247 Cal.Rptr. 185]; *Hooser v. Superior Court* (2000) 84 Cal.App.4th 997, 1003–1004 [101 Cal.Rptr.2d 341].) The party seeking the disclosure of such information must shoulder the "heavy burden" of showing that the evidence serves "a *compelling interest* in 'facilitating the ascertainment of truth in connection with legal proceedings.' " (*Morales,* at pp. 287, 290, italics added; accord, *Boler,* at p. 473; *Hooser,* at p. 1004.) Winfred did not raise this constitutional standard below, so we have not considered it on appeal. (See *Gonzalez v. County of Los Angeles* (2004) 122 Cal.App.4th 1124, 1131 [19 Cal.Rptr.3d 381].)

## III

## DISPOSITION

The judgment is reversed, and the case is remanded for a new trial. Plaintiff is entitled to costs on appeal.

Rothschild, J., and Neidorf, J.,* concurred.

A petition for a rehearing was denied August 27, 2008, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied October 22, 2008, S166804. Werdegar, J., did not particpate therein.

---

*Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.