Filed 11/14/23  Weisbord v. Turtle Beach Corporation CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSHUA N. WEISBORD,<br><br>  Plaintiff, Cross-defendant and Appellant,<br><br>  v.<br><br>TURTLE BEACH CORPORATION, INC. et al.,<br><br>  Defendants, Cross-complainants and Respondents. | D079789<br><br><br>(Super. Ct. No. 37-2017-00014483-CU-WT-CTL) |

APPEAL from a judgment and postjudgment order of the Superior Court of San Diego County, Richard E.L. Strauss, Judge.  Affirmed in part, reversed in part and remanded with directions.

Joshua N. Weisbord, in pro. per.; Manning & Kass, Ellrod, Ramirez, Trester and Scott W. Davenport for Plaintiff, Cross-defendant and Appellant.

Paul, Plevin, Sullivan & Connaughton and George S. Howard, Jr.; Noonan, Lance, Boyer and Banach, David J. Noonan and Micaela P. Banach; Niddrie Adams Fuller Singh and Victoria E. Fuller for Defendants, Cross-complainants and Respondents.

After termination from his employment, plaintiff, cross-defendant and appellant Joshua N. Weisbord filed suit against his former employer, defendants, cross-complainants and respondents Turtle Beach Corporation and Voyetra Turtle Beach, Inc. (collectively Turtle Beach)[1] alleging, among other claims, wrongful termination in violation of public policy and whistleblower retaliation in violation of Labor Code section 1102.5. Turtle Beach responded with a cross-complaint alleging in part that Weisbord breached his employment agreement, and converted and withheld Turtle Beach's property in violation of Penal Code section 496 (hereafter section 496), entitling Turtle Beach to recover three times its actual damages, plus costs and attorney fees. After trial on Weisbord's whistleblower retaliation claim and entry of a directed verdict on the referenced claims in Turtle Beach's cross-complaint, the jury returned a special verdict against Weisbord on his claim and awarded Turtle Beach $34,262.09 in damages on its claims, also finding that Turtle Beach proved Weisbord acted with malice, fraud or oppression in refusing to return Turtle Beach's property. Thereafter, the court entered a $205,572.54 judgment in Turtle Beach's favor, consisting of treble the actual damages under section 496 ($102,786.27), plus another $102,786.27 in punitive damages based on the parties' stipulation on the record that punitive damages would be three times the actual damages amount. The judgment provided that Weisbord would take nothing on his complaint.

---

[1] The parties referred to the defendants collectively as Turtle Beach throughout the trial, so we adopt their shorthand.

Weisbord contends the trial court denied him his fundamental right to due process by preventing him from introducing evidence of events occurring after March 24, 2016, the date of a Turtle Beach earnings release that Weisbord claimed was the subject of his whistleblower complaint. Weisbord further contends the court prejudicially abused its discretion by allowing Turtle Beach to admit into evidence his two DUI convictions and evidence of his non-work-related or family income, which denied him his right to a fair trial. Weisbord finally contends the court erred by awarding statutory treble damages in addition to punitive damages. We conclude Weisbord's latter argument has merit. We reverse the postjudgment order and judgment insofar as they award both treble and punitive damages on Turtle Beach's claims against Weisbord, and on remand direct the trial court to order Turtle Beach to elect its remedies and thereafter vacate one of the $102,786.27 awards. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Weisbord does not challenge the sufficiency of the evidence of the jury's special verdicts, particularly its verdict in Turtle Beach's favor on his wrongful termination/whistleblower complaint. Nor does Weisbord challenge the directed verdict in Turtle Beach's favor on its claims for breach of contract, conversion and violation of section 496. Thus, we limit the background to a general overview of Turtle Beach's case, stated in the light most favorable to the verdicts in its favor, as well as facts and procedure related to Weisbord's challenges to the court's asserted limitation of evidence, its other challenged evidentiary rulings, and the damages issue. We state more specific facts below to the extent necessary to address error and prejudice.

3

In May 2014, Turtle Beach hired Weisbord to work in investor relations and eventually other areas such as business development. He was notified his employment was at-will, and he signed an employee handbook advising him he was required to return company electronic devices and company information on request.

Though Weisbord performed well in some aspects of his work, he also acted unprofessionally with Turtle Beach's chief executive officer Juergen Stark and inappropriately with others, making vulgar or sex-related comments to or about female co-workers, at times angrily screaming and yelling profanities, and calling people "idiots." Coworkers perceived his actions as manipulating and calculating, or rude and argumentative. He bragged about wealth or his father's importance to the company and claimed to have employees on a "hit list," suggesting he was able to eliminate individuals he did not like and telling one she was "replaceable." When confronted with his behavior, Weisbord was defensive and uncooperative.

In early 2016, Turtle Beach executives prepared an earnings release for the company that eventually was issued on March 24, 2016. That document reported the company's full year 2015 and fourth quarter 2015 results, as well as estimates for year 2016 and 2016's first quarter. Though Weisbord was involved to some extent in editing the document, he did not e-mail anyone before issuance of the March 24 release to say the first quarter or full year 2016 forecast numbers were false, fraudulent, or inaccurate, or that he wanted to change them. Nor did Weisbord make such a suggestion or accusation in meetings during March 2016. To the contrary, Weisbord gave input on the release to add context about the information for investors' benefit.

At about the same time in March 2016, Turtle Beach staff gave Weisbord a written plan to improve his performance. However, he refused to sign it.

Following complaints and an investigation, Weisbord agreed to leave the company as of April 11, 2016. At no time before that day had Weisbord ever sent an e-mail claiming that anyone at Turtle Beach was publishing knowingly false financial information.

Turtle Beach eventually terminated Weisbord's employment in late May 2016 after he declined to cooperate in an investigation or sign a separation agreement. Although Weisbord had agreed via an employee handbook and proprietary information agreement to return all company-issued personal electronic devices and confidential information upon his termination, Weisbord never did so. On May 19, 2016, Weisbord e-mailed individuals about his employment termination, stating in part, "Note, they want my devices now. Worry not. They ain't getting them, so they won't fire."

Weisbord sued Turtle Beach in April 2017. In part, he alleged as a "direct and legal result" of Turtle Beach's and Stark's actions, including their violations of Labor Code section 1102.5, he suffered emotional and mental distress. Turtle Beach cross-complained against him, and the matter proceeded to trial only on Weisbord's Labor Code section 1102.5 whistleblower retaliation claim, as well as Turtle Beach's claims for breach of contract, conversion and violation of section 496. In connection with its cross-complaint, Turtle Beach presented an expert digital forensics examiner who testified that he was never able to inspect the actual devices Weisbord used while Weisbord was at Turtle Beach. According to the expert, unless the devices were found, it was "impossible to know what has happened to Turtle

Beach's data," including whether Weisbord or anyone else "put a thumb drive in . . . and downloaded a bunch of data."

Following the close of evidence, the trial court granted Turtle Beach's unopposed motion for a directed verdict in its favor on its cross-complaint. The jury then returned a special verdict against Weisbord on his whistleblower claim and awarded Turtle Beach $34,262.09 in damages, also finding that Turtle Beach proved Weisbord acted with malice, fraud or oppression in refusing to return its property. The parties put a stipulation on the record, advising the court that they had "agreed that the amount of punitive damages due to Turtle Beach from Weisbord would be three times the finding amount in section 9 of the verdict. So three times $34,262.09."

After the court entered the above-referenced $205,572.54 judgment in Turtle Beach's favor, Weisbord moved to amend or alternatively vacate it under Code of Civil Procedure section 663 and to enter a new judgment with reduced damages totaling $102,786.27. Relying on *Fassberg Construction v. Housing Authority of Los Angeles* (2007) 152 Cal.App.4th 720 (*Fassberg*), he argued the judgment contained duplicative treble damages arising from the same conduct of possessing and withholding Turtle Beach's property in violation of section 496, which also constituted common law conversion, permitting punitive damages. The trial court denied the motion. Citing *Bell v. Feisbush* (2013) 212 Cal.App.4th 1041 (*Bell*) and *Switzer v. Wood* (2019) 35 Cal.App.5th 116 (*Switzer*), it ruled "imposition of 'actual' damages and for damages pursuant to [section] 496 are permissible under the facts of this case."

Weisbord filed this appeal from the judgment and postjudgment order.

6

DISCUSSION

I. *Claim of Due Process Violation*

Weisbord contends the trial court limited the scope of his Labor Code section 1102.5 whistleblower claim by disallowing evidence concerning certain events occurring after the March 24, 2016 release date of Turtle Beach's earnings report. He maintains the order denied him his fundamental due process rights to present his case and admissible evidence. Specifically, Weisbord asserts that despite his complaint's allegations in support of his whistleblower claim,[2] the court "determined that [his] claims for retaliation where [*sic*] limited to whether [his] whistleblower claims arose out of the publication of knowingly false financial information in Turtle Beach's March 24, 2016 Earnings Release," thus limiting evidence of his damages to this time period, and precluding evidence showing additional retaliation or corroborating his claims of Turtle Beach's illegal conduct. According to Weisbord, the court's ruling " 'was tantamount to a nonsuit,' " warranting a special review standard by which we assess the evidence in the light most favorable to him as the appellant.

The arguments are without merit for several reasons. First, they are unsupported by the record. In making the argument, Weisbord cites only to the jury's special verdict form, and presumably its first question which the

_____

[2]     Weisbord says he alleged: "(1) that he discovered material misrepresentations in a release issued on March 24, 2016 . . . ; (2) that on April 11, 2016, the [*sic*] was a decision to part amicably . . . ; (3) that on April 26[,] 2016, he discovered illegal option grants in [Securities and Exchange Commission (SEC)] filings . . . ; (4) that on May 2, 2016, he e[-]mailed a formal whistleblower complaint . . . ; (5) that on May 3, 2016, Turtle Beach retaliated against him by placing him on involuntary leave . . . ; and (6) that on May 27, 2016, Turtle Beach fired him . . . ."

7

jury answered in the negative: "Did Turtle Beach believe that Joshua Weisbord had disclosed to an employee with authority to investigate, discover, or correct legal violations/noncompliance, a violation of federal law arising from the publication of knowingly false financial information in the 2016 Outlook section of Turtle Beach's March 24, 2016 Earnings Release?" But the special verdict form, which is typically prepared by one or both parties and in this case was accepted by both,[3] does not necessarily reflect any *court-imposed* limitation on the evidence.

Weisbord does not point to any trial court in limine order, much less any order, precluding him from introducing evidence of post-March 24, 2016 events. In fact, he says "[*i*]*t is unclear* why the trial court chose to limit [his] case and preclude the introduction of evidence which was relevant to his Labor Code [section] 1102.5 claim." (Italics added.) He also asserts "*there . . . does not appear to be any reason* for the application of an artificial deadline of March 24, 2016, a date which precedes the final dates of the retaliation." Turtle Beach, for its part, responds that Weisbord must be referring to a motion in limine it brought to exclude as irrelevant evidence of an untimely

---

[3] Following the close of evidence, defense counsel handed the special verdict form to the court, saying, "I handed you the verdict form, *which is agreed upon* for Phase 1 today—[¶] . . . [¶]—and a couple versions of a Phase 2 depending on how the jury comes out on punitives either way. *We're all agreed on that.*" (Italics added.) Absent a showing otherwise, we would be entitled to consider whether Weisbord invited the error in the manner the verdict form was styled. (See *Khoiny v. Dignity Health* (2022) 76 Cal.App.5th 390, 419 [error is invited when a party purposefully or affirmatively induces the commission of error, but not where a party endeavors to make the best of a bad situation for which it was not responsible].) Turtle Beach does not argue invited error so we do not address it.

disclosure it made to the SEC of certain option grants to company executives.[4]

As we explain below, the abuse of discretion review standard is applicable to Weisbord's claim that the court erroneously excluded key evidence. (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295–296 [abuse of discretion standard applies to rulings on in limine motion to exclude evidence]; *Osborne v. Todd Farm Service* (2016) 247 Cal.App.4th 43, 50–51 [admissibility of evidence generally reviewed for abuse of discretion]; *Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 44–45.) But absent some indication of the court's analysis or legal basis in reaching any such evidentiary ruling and Weisbord's explanation as to why it is arbitrary, capricious or patently absurd (*K.M. v. Grossmont Union High School Dist.* (2022) 84 Cal.App.5th 717, 760; *Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 132), we are unable to assess it under that standard. For the same reason, Weisbord does not overcome the appellate presumption that the judgment is correct, and that the record must establish prejudicial error. (*Rancho Santa Fe Assn. v. Dolan-King*, at p. 46; *Ritschel v.*

---

4      In response to defense counsel's argument on that in limine motion, Weisbord's counsel stated the evidence went to Stark's state of mind, but told the court Weisbord had no interest in eliciting testimony that it was an SEC violation. He proceeded to tell the court that defense counsel had mischaracterized Weisbord's theory of the case, saying it was not just about Weisbord's May 2016 whistleblowing: "This case is not about that. Mr. Weisbord engaged in protective disclosure of [SEC] violations in March and April [2016], continuing through and critical of an 8K form that was filed on April 5th . . . ." Weisbord's counsel maintained that Stark's conduct in April was "relevant to corroborate that." Defense counsel replied that there was no fine or fallout from the late recording, which was not an SEC violation. The court granted the motion, stating, "I don't see how that has anything to do with Mr. Weisbord." Weisbord does not point to or make any argument concerning the court's reasoning on this evidentiary motion, so we presume it was correct under settled appellate principles.

9

*City of Fountain Valley* (2006) 137 Cal.App.4th 107, 122.)

Because Weisbord does not identify any court ruling limiting his evidence in such a manner, we cannot say whether the court entered the functional equivalent of a nonsuit, requiring a different review standard or amounting to "presumptive error" as Weisbord claims. (See *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27–28 [order granting in limine motion to "bar *all* statements made by respondents and the other defendants prior to execution of . . . releases [related to plaintiffs' reports of damage to their home] eliminated the "bulk of the evidence upon which appellants base[d] their causes of action for fraud and willful misconduct" and was the "functional equivalent" of a nonsuit].)[5]

Even assuming the court limited the evidence in the manner Weisbord claims, that kind of ruling would not serve to eliminate Weisbord's whistleblower claim or constitute a wholesale exclusion of evidence on it as he claims. According to Weisbord, the court eliminated evidence regarding SEC filings showing purportedly illegal option grants to Stark, and

---

[5]    The other two cases cited by Weisbord are inapposite as well. In *Tan v. Arnel Management Co.* (2009) 170 Cal.App.4th 1087, the court entered a judgment on the pleadings in favor of the defendants based on evidence presented in an in limine hearing (testimony regarding prior violent crimes against others on common areas owned or managed by the defendants). (*Id.* at pp. 1090, 1092–1093, 1095.) Because the court's ruling addressed evidence, it "went beyond the four corners of the pleading" and was the "functional equivalent of a motion and order for nonsuit." (*Id.* at pp. 1094–1095.) In *Fergus v. Songer* (2007) 150 Cal.App.4th 552, the court's order granting an in limine motion "precluded appellants from proceeding on most of their causes of action." (*Id.* at p. 569.) The court said, "Where . . . the granting of a motion in limine disposes of one or more causes of action, it is the functional equivalent of the granting of a nonsuit as to those causes of action." (*Id.* at pp. 569–570.) At least as Weisbord characterizes the court's purported ruling, it did not eliminate his whistleblower cause of action.

10

Weisbord's complaints about them. A ruling on "discrete categories of evidence" (*Osborne v. Todd Farm Service, supra*, 247 Cal.App.4th at p. 51) would "not exclude all possible evidence supporting [Weisbord's whistleblower] claims" and thus would "not have the effect of granting a nonsuit or judgment on the pleadings." (*Ibid*.) Hence, the normal abuse of discretion standard applies, which Weisbord has not overcome.

We observe, as Turtle Beach points out, that during a lengthy jury instruction conference exchange, Weisbord sought to include in one instruction reference to Turtle Beach including knowingly false financial information in not only the March 24, 2016 SEC filing but also an April 5, 2016 filing. Defense counsel asserted that the latter April filing was not pleaded, litigated, or raised in discovery, including in Weisbord's deposition, and that it went beyond the theory of the case. Weisbord's counsel argued Weisbord was entitled to conform to proof, and asserted there was evidence Turtle Beach's misrepresentation as to its profitability "was repeated from March 24th on to April 5th." Ultimately, the court agreed with defense counsel that if issues about the April 5, 2016 filing had not been raised in discovery, it would use Turtle Beach's version of the jury instruction, which was limited to the March 24, 2016 filing. Weisbord does not address or challenge in any meaningful way the court's jury instruction ruling in this regard. We consider any such challenge forfeited. (*Abatti v. Imperial Irrigation District* (2020) 52 Cal.App.5th 236, 300 [failure to address issue in opening brief forfeits it].)

II. *Claim of Improper Admission of Weisbord's Alcohol-Related Convictions and Non-Work-Related Income*

A. *Background*

    1. *Convictions*

Before trial, Weisbord moved under Evidence Code sections 350 and 352 to exclude evidence relating to two alcohol-related misdemeanor convictions that he had in 2018 and 2019,[6] on grounds the convictions were irrelevant to and not probative of the emotional distress he suffered following the 2016 events at Turtle Beach. Weisbord maintained the evidence threatened to undermine his ability to defend his retaliation case and severely prejudiced him by likely causing the jury to question his respect for the law and the reasonableness of his judgment.

The arguments on Weisbord's motion were effectively combined with those relating to a defense expert witness, Dr. Kalish. During those arguments, defense counsel pointed out that Weisbord in an August 2019 deposition testified that his "overall mental condition" was "much worse" than it had been before March 2016. According to defense counsel, in the same time frame Weisbord had also answered interrogatories in which he recited the emotional conditions attributable to defendants, stating he suffered "loss of appetite, headaches, emotional . . . distress, depression,

---

[6] During the in limine motion hearing, defense counsel stated: "[Weisbord] had the first arrest on February 21 of 2018. He was arrested for a DUI. He pleaded guilty to a wet reckless, which is a downplay, on January 8th, 2019, again within the three-year period [after his termination] that was alluded to this morning. And then only 10 months after the first arrest he got arrested again on December 20, 2018[,] for a second DUI for which he went to trial on in Vista and was convicted unanimously by a jury on May 1 of 2019."

which is a diagnosable condition, anxiety, which is a diagnosable condition, and lack of trust, remaining about the same and constant and continuous." Defense counsel argued Weisbord at trial was narrowing his claims or attempting to change his testimony. Weisbord's counsel responded in part that Weisbord's emotional distress damages were "cut off in November of [20]16" and thus the DUI's were irrelevant and extremely prejudicial. Defense counsel then stated that if Weisbord were to testify to that, he would cross-examine him about his prior discovery responses. Defense counsel also stated that Weisbord claimed he did not work during the period after his termination, and the DUI's could have affected his employability. This exchange then occurred, in which the court denied Weisbord's motion:

"[Plaintiff's counsel]: Why would adding a DUI affect his employability? That's a fishing expedition. This is just an attempt to attack his character. This is clearly a[n] [Evidence Code section] 352 [*sic*]. A DUI has nothing to do with this employment case. There is no reason a person couldn't find a job or get a job because of a DUI. . . . [¶] And, furthermore, we have litigation evidence of—is that he's earned money in 2017 and [20]18. This is just trying to get into evidence to smear Mr. Weisbord's name.

"[Defense Counsel]: Well, he did it to himself, your honor. [¶] In a period of time he was claiming that my client caused him severe emotional distress, much worse than it was three years before. He can't just re-create his testimony.

"The Court: [Weisbord] created his own bed. [¶] I'm denying the motions."

2. *Income*

Weisbord similarly moved to exclude evidence of any income he had derived from anything other than the performance of his work as an

13

employee or independent consultant as irrelevant to the litigation issues, including Turtle Beach's defenses of mitigation and avoidable consequences. He argued any suggestion he was of above-average means based on his family's financial resources risked prejudicing the jury against him and his damages recovery.

At arguments on the motion, defense counsel agreed not to use the evidence on the issue of Weisbord's entitlement to damages, but only to show his bad behavior in the workplace in which he assertedly "flaunted his family's wealth and influence with the company as a justification to treat people poorly, intimidate them and manipulate them." According to defense counsel, evidence that Weisbord said his family had so much money that he could do "whatever I want" directly rebutted his whistleblower claim.

The court denied Weisbord's motion, ruling "it is part of his story in terms of how he interrelated with other people."

B. *Standard of Review*

Weisbord correctly acknowledges that we review the court's evidentiary rulings for abuse of discretion. (*Dart Industries, Inc. v. Commercial Union Insurance Company* (2002) 28 Cal.4th 1059, 1078.) Under this standard, a court must not disturb a court's admissibility ruling " ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 97; *K.M. v. Grossmont Union High School Dist.*, *supra*, 84 Cal.App.5th at p. 760.) It is Weisbord's burden on appeal to show not only that the court erred because its ruling met these standards, but also explain how admission of the evidence was prejudicial to him. (Cal. Const., art. VI, § 13 [no reversal of judgment for erroneous admission of evidence without a showing of a miscarriage of justice]; Evid. Code, § 353

[same]; *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1038 [burden of showing prejudice is on the appellant challenging an evidentiary ruling].)

C. *Weisbord Has Not Demonstrated Error or Prejudice*

Weisbord contends the court abused its discretion by its evidentiary rulings. He argues defense counsel exploited the evidence of his alcohol-related convictions by being "allowed to drill down to minutiae regarding the charges, the blood alcohol level, Weisbord's actions of telling his family about the convictions, whether Weisbord could legally drive in California, the amount of the fines, the fact that Weisbord had to borrow money from his family to pay the fines and fees, and even attempts to elicit attorney-client protected conversations." He argues introduction of the evidence "was shocking and without justification" and that despite the court's broad discretion in admitting evidence, "no reasonable jurist would allow this testimony to be introduced," warranting reversal of the judgment.

As for evidence of his financial resources, Weisbord argues the impact of the court's ruling was "devastating." He maintains that rather than addressing the merits of the complaint and cross-complaint, "the trial devolved into a sideshow regarding bizarre tangential issues: whether Weisbord used profanity, or wrote in all capital letters, was convicted of a DUI *years* after he was terminated, or . . . whether he came from a family of means." According to Weisbord, the evidence "changed the entire dynamics of the trial," which was reduced to a "smear campaign designed to place [his] character on trial." Because the trial in total was "completely infected," Weisbord argues, the evidence's admission "eliminat[ed] any possibility of declaring [the ruling] harmless."

15

In making these contentions, Weisbord does not engage in a reasoned analysis of the challenged evidence's relevance or its collateral nature. That is, he fails to explain why his convictions or the financial evidence had no " 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*Conservatorship of K.P.* (2021) 11 Cal.5th 695, 716, quoting Evid. Code, § 210; *Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1132; *Winfred D. v. Michelin North America, Inc., supra*, 165 Cal.App.4th at p. 1026.) It is not enough to make cursory statements that the evidence was tangential or that no reasonable judge would allow it to be introduced. Weisbord must identify in some meaningful way how it had no relation to the disputed facts at trial or lacked "connection to a substantive issue." (*Winfred D.*, at p. 1026.)

For example, in *Winfred D. v. Michelin North America, Inc., supra*, 165 Cal.App.4th 1011, the appellate court held the trial court abused its discretion by admitting irrelevant evidence of a plaintiff's infidelity, extramarital affairs, and second family in Las Vegas in an auto accident/product defect case in which the issue was the accident's cause. (*Id.* at pp. 1014, 1017, 1029, 1038.) More particularly, "the substantive issue was whether [the plaintiff's] vehicular accident was caused by a tire defect, as he asserted, or by overloading the van with produce, as [the defendant] contended." (*Id.* at p. 1027.) None of the court's stated reasons justified the evidence's admission; the plaintiff rented a van for a business pursuit: to transport produce to Las Vegas, and his business was formed long before his second family existed. (*Id.* at p. 1028.) And to the extent the evidence of the plaintiff's private life was relevant to his credibility, it was more prejudicial than probative. (*Id.* at p. 1029.) It was also entirely collateral for impeachment purposes: "In a personal injury case where a plaintiff has a

16

partial loss of memory due to brain damage, the defendant cannot ask the plaintiff what he recalls about illicit aspects of his private life that have no bearing on the cause of the accident or bias and are irrelevant and prejudicial." (*Id.* at p. 1036.) Nor was there evidence of the plaintiff's financial circumstances in the record sufficient to suggest the plaintiff had a motive to overload his truck so as to support two families. (*Id.* at pp. 1037–1038.)

Weisbord does not explain with any similar detail how the challenged evidence bears no relation to the substantive issues in his wrongful termination case, in which evidence suggested he wielded his wealth and his father's board position over others,[7] and sought emotional distress damages, putting his mental condition at issue. He characterizes the conviction evidence as "character evidence" but cites no authority discussing character evidence and standards for its admissibility or inadmissibility. Weisbord mentions broad issues such as "whether [he] was fired for whistleblowing" or

---

[7]    Stark testified about an e-mail he had sent to Weisbord in March 2016 about Weisbord's behavior, explaining it related to Weisbord's "habit of, you know, telling people that he was wealthy and had a strong relationship with me and with the board and could get things to happen and that—you know, make himself seem bigger and more important than he was, and that didn't rub people very well." Another witness testified: "Josh had repeatedly told me how important he was in the company and that his dad was a major investor and he had a first line of communication with our board of directors. So I was afraid that if I did anything to document him, even though I knew as an HR person this was inappropriate, but I was afraid of retaliation. I was afraid I would lose my job." When asked whether Weisbord said anything causing her to think her job might be in jeopardy if she did something wrong, she testified: "Yes. Him always insinuating how important he was and that there were other high-level executives in the company that he didn't like that were, you know, now no longer with the company. So he was insinuating you get on his bad side, he does not like you, then he has the power to get you removed from the organization."

"whether [he] failed to return company property and/or data," but ignores his deposition testimony recounted above on which the court relied for its ruling or the trial evidence in which he testified that losing his job was "demoralizing [and] disturbing," that it had "taken a big toll on [his] life," and that "those feelings [he experienced] will never leave you as to what exactly happened . . . ." His arguments do not demonstrate the court's in limine rulings were patently absurd, arbitrary or capricious. He has not demonstrated a manifest abuse of discretion.

Nor has Weisbord meaningfully shown prejudice. In *Winfred D.*, the evidentiary rulings allowed the defendant to "from start to finish . . . paint[ ] the plaintiff as a liar, cheater, womanizer and a man of low morals based principally, if not solely" on the inadmissible evidence of affairs, concurrent marriages, and illegitimate children." (*Winfred D. v. Michelin North America, Inc.*, *supra*, 165 Cal.App.4th at p. 1038.) One issue at trial was whether the plaintiff overloaded his vehicle. (*Id.* at p. 1039.) Defense counsel argued that the plaintiff "could not recall the facts of his illicit private life, but . . . could remember not to put 2,000 pounds of produce in the van" and also that given plaintiff's "failure to recall the name of his mistress—with whom he had two sons and to whom he had recently given $1,000—he could not possibly remember the details of how he ran his business." (*Id.* at p. 1039.) Further, defense counsel suggested the plaintiff overloaded the van "to make enough money to support two families." (*Id.* at pp. 1039–1040.) The arguments "affected the central issue in the case: whether the van was overloaded, on the one hand, or whether the tire was defective, on the other." (*Id.* at p. 1040.) Observing the closeness of a verdict is only one factor in assessing whether an error is prejudicial, the Court of Appeal determined prejudice was shown as the erroneous rulings permitted the defendant to

18

"parade [plaintiff's] illicit, intimate conduct before the jury—smearing his character and inflaming" it and the rulings "likely tainted the entire verdict." (*Ibid*.) It concluded: "Having reviewed the testimony of the parties' experts and the other witnesses as well as the relevant exhibits, it appears reasonably probable that were it not for the trial court's incorrect evidentiary rulings, a result more favorable to Winfred could have been obtained." (*Ibid*.)

With regard to his alcohol-related convictions, Weisbord points to eight pages of the reporter's transcript where defense counsel assertedly went into "minutiae" about them. In the transcript before the referenced pages, defense counsel questioned Weisbord about his testimony that he suffered emotional distress as a result of his termination. Weisbord acknowledged being on medication for anxiety and depression since college and seeing "a few" psychiatrists over a long period of time. Counsel asked if there had been other stressors in his life after leaving Turtle Beach, to which Weisbord asserted there was "stress every day" and asked counsel to "tell me what stressors." Defense counsel then asked about Weisbord's DUI convictions. but Weisbord denied those convictions had anything to do with his emotional distress related to the workplace. Defense counsel then read from Weisbord's deposition, in which he testified under oath his guilty plea and conviction caused him "zero" emotional distress and denied any such distress stemming from other aspects of the incidents—being convicted by a jury, being unable to drive in California, spending most of the night in jail, paying fines, and borrowing money from his parents.

We cannot say this technique by defense counsel pervaded the entire case, and Weisbord's assertion that it was "shocking and without justification" does not demonstrate that without it, the jury would have

19

reached different verdicts. (*Winfred D. v. Michelin North America, Inc.*, *supra*, 165 Cal.App.4th at p. 1040.)

As for the financial evidence, Weisbord does not even point to the portions of the record where Turtle Beach supposedly used it at trial. His assertion that the case "devolved into a sideshow" about tangential issues lacks record citations. And some of those assertedly tangential issues—his use of profanity or writing style—are evidentiary matters he does not challenge on appeal. His cursory arguments simply do not establish the kind of prejudicial impact warranting reversal of the judgment.

III. *Damages Issues*

Weisbord contends that the trial court's $205,572.54 damages award was error, and contrary to the parties' post-verdict stipulation that punitive damages would be three times the jury's actual damage award. He maintains that despite the jury's verdicts giving Turtle Beach three separate theories of recovery (conversion, breach of contract, and violation of section 496), there was only one event—his failure to return company devices or information after his employment termination—that warranted damages. According to Weisbord, *Fassberg*, *supra*, 152 Cal.App.4th 720 prohibits duplicative punishments arising from the same course of conduct. He argues "[t]here can be no dispute" that both the treble damages available under section 496 and the punitive damages arising from the conversion claim are punitive in nature, and he should not be punished twice for the same conduct.

In response, Turtle Beach concedes that "when the purpose of a statutory 'penalty is the same as that of punitive damages,' a 'plaintiff cannot obtain a double recovery and must elect to have judgment entered in an amount which reflects either the statutory trebling or the compensatory and punitive damages.'" It asserts courts must analyze the nature of the awards

20

in light of the factual circumstances to assess whether the treble damage awards serve the same or different purposes as punitive damages. But Turtle Beach argues the court properly awarded both the section 496 treble damages and the stipulated punitive damages. It argues its counsel did not abandon any claim for treble statutory damages in entering into the punitive damages stipulation, and Weisbord did not argue below that defense counsel had abandoned such a claim, thus forfeiting that argument on appeal. Turtle Beach maintains there is no categorical rule precluding recovery of both damage awards; that legislative history establishes the section 496 treble damages serve a compensatory, not punitive, purpose, and under these factual circumstances, unlike in *Fassberg*, the trial court in this case impliedly found the award was compensatory. Turtle Beach argues that the court's implied finding is supported by evidence that Weisbord withheld Turtle Beach property for more than five years and concealed the fact he lost or otherwise lacked possession of it, unnecessarily increasing Turtle Beach's costs to locate the property and making it "impossible for [it] to know or recover its actual damages."[8]  Again distinguishing *Fassberg*, *supra*, 152

---

[8]     Turtle Beach points to its argument below in opposition to Weisbord's motion to vacate the judgment that it was not able to determine its actual damages: "[N]o one, including the [c]ourt, can determine what Mr. Weisbord has done in the past five and a half years with Turtle Beach's valuable property. Mr. Weisbord unlawfully retained and used [*sic*] highly valuable, confidential property including Turtle Beach's sales and marketing data, business plans, sales projections, information regarding its clients' needs and purchasing history, drafts of filings with the [SEC], voluminous and detailed financial information, and other information not available to the public." It argued that the "only monetary damages Turtle Beach could prove and recover, as a result of Weisbord's concealment and withholding of Turtle Beach's property, were the costs of an expert consultant to attempt to determine what occurred" but "[t]hose amounts clearly [did] not adequately compensate for the harm suffered from the loss for more than five years (and

21

Cal.App.4th 720, it argues that the award provided it partial compensation for Weisbord's intentional theft of its proprietary information, and $102,786.27 in treble damages "was not so large under the circumstances that it necessarily rendered an award of punitive damages duplicative or unwarranted."

A. *Weisbord Forfeited His Contention Concerning the Parties' Stipulation*

Having reviewed Weisbord's motion as well as the oral arguments on it, we agree with Turtle Beach's forfeiture argument. Weisbord did not raise below counsel's stipulation as a reason to vacate the statutory treble damages award. Counsel's intent in reaching the stipulation would have been a factual matter for the trial court to assess. (Accord, *Brawerman v. Loeb & Loeb LLP* (2022) 81 Cal.App.5th 1106, 1116 [parties' purposes and intents in entering into an agreement is for the trier of fact; " '[q]uestions of "intent" and "purpose" are ordinarily questions of fact to be determined by the trial court' "], quoting *Redke v. Silvertrust* (1971) 6 Cal.3d 94, 103.) We cannot address such fact questions for the first time on appeal. (*Breslin v. Breslin* (2021) 62 Cal.App.5th 801, 806.) Weisbord forfeited this contention by failing to raise it below.

B. *Improper Double Recovery of Statutory and Punitive Damages*

We turn to Weisbord's claim of duplicative damages. Weisbord does not squarely address the applicable standard of review. As stated, Turtle Beach argues we must review the court's implicit fact finding on Weisbord's motion—that under the particular circumstances the section 496 treble damages served a compensatory purpose—for substantial evidence. But Turtle Beach does not point to disputed evidence on the subject, and it

probable, *as yet unknown* misuse) of highly sensitive, valuable commercial information." (Italics added.)

22

appears that the relevant underlying facts—that Weisbord intentionally withheld his company devices and other property, as well as Turtle Beach's inability to prove actual damages apart from paying an expert consultant to determine what occurred—are undisputed.[9] Application of a statutory standard to undisputed facts, as well as the proper measure of damages in a particular case, are issues of law subject to de novo review. (*Switzer v. Wood*, *supra*, 35 Cal.App.5th at p. 125.) Ultimately, we need not finally decide the applicable standard of review, as we would reverse under either de novo or substantial evidence review. In view of section 496's text and purpose, as well as the nature of the awards here, we conclude the treble damages it authorizes functioned as primarily punitive in this case. Further, any implied factual finding that the treble damages served a compensatory purpose here is not supported by the record, which shows Turtle Beach was compensated for its actual losses by the jury's $34,262.09 damage award, and there were no additional independently provable damages that treble damages could conceivably compensate.

---

[9]    In keeping with the evidence presented at trial, Turtle Beach's counsel argued in closing: "[Weisbord] admitted on the stand that he retained Turtle Beach data in his personal devices when he was terminated. He never gave the data back and he never permitted Turtle Beach to get the data off the personal devices he used while employed." He stated: "[Weisbord] signed the employee handbook that specifically said he would upon termination make any personal devices available so that the data, the proprietary data, and documentation could be removed. And he signed the proprietary information agreement again stating that upon termination, he would return all Turtle Beach property, including data. Basically, it says, quotes, in the agreement, 'I will not keep any Turtle Beach property.' And he admitted he did neither. He kept those data and those devices and refused to make the devices available to Turtle Beach. He had at least three such devices."

23

1. *Legal Principles*

" 'Regardless of the nature or number of legal theories advanced' " by a plaintiff or cross-complainant, " 'he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited. [Citation.] [¶] . . . [¶] In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff [or cross-complainant] is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories.' " (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 701, quoting *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158–1159.)

These principles apply to limit awards of both punitive damages based on conduct constituting malice, fraud and oppression,[10] and statutory civil penalties. In *Fassberg*, the Court of Appeal held that a trial court's award of both treble damages and $500 civil penalties under the California False Claims Act imposed for each of almost 3,000 false claims was mostly or primarily punitive in nature, such that the punitive damages imposed by the jury were duplicative. (*Fassberg, supra*, 152 Cal.App.4th at pp. 731–732, 761–762.) *Fassberg* observed that "California courts have held that if a defendant is liable for a statutory penalty or multiple damages under a statute, the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages, the plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy." (*Id.* at pp. 759–760.) But the court did not decide "categorically" that the treble damages and civil penalties authorized by the False Claims Act precluded punitive damages; it "focus[ed] on the nature of the awards [citation] to determine whether the treble damages award and civil penalty included sufficient amounts serving a punitive objective so as to render an additional award of punitive damages a prohibited double recovery under

---

10     For purposes of punitive damages, " ' "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.' ([Civ. Code,] § 3294, subd. (c)(2).) ' "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.' ([Civ. Code,] § 3294, subd. (c)(3).) ' "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.' ([Civ. Code,] § 3294, subd. (c)(1).)" (*Anderson v. Ford Motor Co.* (2022) 74 Cal.App.5th 946, 963.)

California law." (*Ibid.*) It reasoned: "Considering the amount of the civil penalty ($1,491,500) relative to the amount of the [cross-complainant Housing Authority's] purported actual damages resulting from false claims ($455,000), together with our conclusion that the majority of the treble damages award served a punitive purpose, we are compelled to conclude that the aggregate punitive portion of the treble damages award and civil penalty is sufficiently large that any additional award of punitive damages would be duplicative and unwarranted." (*Id.* at p. 762.)

Another case involving awards of both statutory civil penalties under the Consumer Legal Remedies Act and punitive damages (*Anderson v. Ford Motor Company*, *supra*, 74 Cal.App.5th at p. 950) held the focus should be on the conduct underlying the awards and whether it is the same or different. (*Id* at p. 965 ["In our view, the appropriate inquiry should be focused on the underlying conduct"; court held the "punitive damages and statutory penalties were based on different conduct that took place at different times" as punitive damages were based on the defendant's conduct before a truck sale and the penalties were based on the defendant's post-sale failure to comply with Song-Beverly Act obligations].) *Anderson* rejected reliance on the so-called primary right theory to make this determination, finding it

26

"misplaced" as having a narrow field of application and distinguished from a plaintiff's sought-after remedy.[11]

Recently in *Los Angeles Unified School Dist. v. Superior Court* (2023) 14 Cal.5th 758, 767 (*Los Angeles Unified*) the California Supreme Court touched on issues that bear on Weisbord's claim. The court there was presented with whether to characterize a treble damages provision as punitive or compensatory in the context of deciding whether a provision of the Government Claims Act (Gov. Code, § 818) immunizing public entities from damages "imposed primarily for the sake of example and by way of punishing the defendant" shielded a public entity from liability for enhanced damages under Code of Civil Procedure section 340.1, which permits recovery of up to treble damages for plaintiffs proving a childhood sexual assault was the result of a cover up. (Code Civ. Proc., § 340.1, subd. (b)(1); *Los Angeles Unified*, at p. 764.)

The court determined that the Government Code section at issue "conveys that a damages provision cannot be applied against a public entity if it functions, in essence, as an award of punitive or exemplary damages." (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 770.) But the statute did not explain how punitive and exemplary damages were to be distinguished from

---

11      " ' "The violation of one primary right constitutes a single cause of action, though *it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other*.' [Citation.] Thus, '[m]ultiple remedies may be available to vindicate a single primary right.' [Citation.] [¶] Primary right theory simply does not help [defendant] here. For purposes of avoiding double punishment, what is at issue is the conduct underlying the punitive damages award and the conduct underlying the civil penalties—here, pre-sale fraudulent inducement and the post-sale noncompliance with the Song-Beverly Act." (*Anderson v. Ford Motor Company*, *supra*, 74 Cal.App.5th at p. 969.)

other kinds of awards.  (*Ibid*.)  Thus, interpreting cases, the court held it required a "fact-specific inquiry concerning the damages provision or principle being applied," including as a starting point the "statutory text and basic objective characteristics of the award at issue," as well as nonexclusive considerations such as "whether the damages involved go beyond those necessary to fully compensate the plaintiff [citation]; whether a damages remedy functions to offset some otherwise applicable restriction on compensatory damages [citation]; whether the challenged form of damages is conditioned on morally culpable conduct, beyond mere negligence [citation]; whether there is an element of discretion by the fact finder in the award of damages [citation]; and whether in the normal course actual damages are likely to be difficult to establish or quantify."  (*Id*. at p. 773.)  It explained "the ultimate question remains whether, by virtue of being imposed 'primarily for the sake of example and by way of punishing the defendant' [citation], the damages before the court function, in essence, as a form of punitive or exemplary damages."  (*Ibid*.)

The *Los Angeles Unified* court turned to whether the treble damages authorized by Code of Civil Procedure section 340.1 amounted to punitive damages.  (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 777.)  The court pointed out that the fact the statute authorized treble damages, though significant, was "not conclusive on the characterization question" (*id*. at p. 778) because courts in some instances had characterized treble damages under a given statute as exemplary or punitive but in other instances as serving remedial or nonpunitive purposes.  (*Id*. at pp. 778–779 [citing in part *Cook County v. United States ex rel. Chandler* (2003) 538 U.S. 119, 130 for the proposition that "the tipping point between payback and punishment

28

defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation"].)

In a footnote, the court explained that such classification issues can arise in the context presented here, "when it is claimed that allowing both treble damages and punitive damages would amount to an impermissible double recovery . . . ." (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 779, fn. 7, citing *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 419.)[12] In this scenario (and the others), the court noted, "the classification analysis has been framed by the statutory scheme or common law principles involved and the precise legal issue presented. The outcome of these inquiries may depend on whether a provision is regarded as entirely, primarily, or only partially punitive in nature. These subtleties make it conceivable that a particular treble damages remedy will be regarded as sufficiently punitive to trigger some consequence, but not so thoroughly punitive as to bring about another." (*Los Angeles Unified*, at p. 779, fn. 7.)

The *Los Angeles Unified* court determined the statutory treble damages authorized by Code of Civil Procedure section 340.1 were recognizable as punitive or exemplary "as a matter of both substance and procedure." (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 780.) "These awards require the existence of actual injury, but may go substantially beyond the amounts necessary to fully compensate plaintiffs for the injuries they have suffered; they are premised on morally culpable behavior . . . , namely, participation in 'a concerted effort to hide evidence relating to childhood sexual assault'

---

[12] In *Marshall v. Brown*, *supra*, 141 Cal.App.3d 408, the Court of Appeal required the plaintiff following a new trial to elect between punitive damages and Labor Code section treble damages where she sued for slander and misrepresentation under the Labor Code both based on a letter the defendants had sent. (*Marshall,* at pp. 411–412, 419.)

[citation]; and they are assessed on a case—and fact—specific manner in much the same way that punitive damages are, albeit being subject to a cap." (*Ibid*.) The court rejected an argument that the enhanced damages served important nonpunitive functions that distinguished them from conventional punitive or exemplary damages. It found no legislative history to support the argument that the enhanced damages "recognize and provide redress for litigation-related trauma." (*Id*. at pp. 785–786.) "This is not a situation where . . . the Legislature has 'clearly indicated an additional, compensatory purpose' [citation] of sufficient magnitude that it would allow us to regard a treble damages provision as outside of [Government Code] section 818's purview. [¶] There is also no clear indication in the text of [Code of Civil Procedure] section 340.1[, subdivision] (b)(1), its practical application, or its legislative history that legislators sought to use the possibility of enhanced damages to incentivize the filing of claims that might involve relatively modest damages awards." (*Id*. at p. 786.)

In sum, *Los Angeles Unified* held "the enhanced damages authorized under [Code of Civil Procedure] section 340.1[, subdivision] (b)(1) are 'imposed primarily for the sake of example and by way of punishing the defendant' [citation]. . . . [T]he objective characteristics of these awards establish that they qualify as a form of punitive or exemplary damages for purposes of a [Government Code] section 818 analysis, and there are no clear indications within the statutory text, the expected application of [Code of Civil Procedure] section 340.1[, subdivision] (b)(1), or otherwise of a nonpunitive purpose or purposes that carry sufficient force here as to compel a different characterization." (*Los Angeles Unified*, *supra*, 14 Cal.5th at pp. 786–787.)

2. *Section 496*

We turn to the purpose of section 496 and its treble damages remedy.[13] Section 496, subdivision (a) describes the crime of receiving stolen property. (*Siry*, *supra*, 13 Cal.5th at p. 346.) "As amended in 1972 . . . it provides in relevant part: 'Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained,' is subject to incarceration." (*Ibid*.) "Section 496[, subdivision] (c), similar to some provisions in other statutory schemes,[ ] articulates a right to special civil remedies when a violation of section 496[, subdivision] (a) has occurred. Subdivision (c), as also amended in 1972, states that any person who has been injured by a violation of section 496[, subdivision] (a) 'may bring an action for three times the amount of actual damages, if any, sustained by the

---

13      Section 496 was likewise recently the topic of the California Supreme Court in *Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333 (*Siry*), which decided that the treble damages and attorney fees authorized by section 496 are available in business disputes involving theft of property. The high court was not presented with a question of duplicative damages; notably in that case, the trial court required the plaintiff alleging fraudulent diversion of partnership funds to choose between either treble damages or punitive damages, and the plaintiff elected to collect treble damages. (*Siry*, at p. 342, see *id*. at p. 361.) *Siry* interpreted section 496, subdivision (c) as unambiguously allowing a "plaintiff [to] recover treble damages and attorney's fees . . . when property has been obtained in any manner constituting theft." (*Id*. at p. 361.) In deciding that issue, it "endorse[d]" the analysis of the two cases relied upon by the trial court in this case: *Bell*, *supra*, 212 Cal.App.4th 1041 and *Switzer*, *supra*, 35 Cal.App.5th 116. *Siry* quotes *Bell*'s legislative history analysis, which it describes as "apt[ ]." (*Siry*, at p. 347.)

plaintiff, costs of suit, and reasonable attorney's fees.' " (*Siry*, 13 Cal.5th at pp. 346–347.)

In 1972, the Legislature added the language of subdivision (c) allowing a civil action for damages. (*Siry*, *supra*, 13 Cal.5th at pp. 347–348, see also *Bell*, *supra*, 212 Cal.App.5th at p. 1047.) " ' "The bill was introduced at the request of the California Trucking Association, with the goal of eliminating markets for stolen property, in order to substantially reduce the incentive to hijack cargo from common carriers. [Citation.] Yet while an early version of the bill limited the plaintiffs who may bring civil actions to *public carriers* injured by the knowing purchase, receipt, concealment, or withholding of stolen property [citation], the bill was subsequently amended to expand the class of potential plaintiffs to include '[a]ny person who has been injured by' the knowing purchase, receipt, concealment or withholding of stolen property. [Citation.] Moreover, that same amendment included the *sale* of knowingly stolen property within its prohibitions, and allowed any person injured by the sale of knowingly stolen property to bring a civil action. In other words, it is apparent that the statute, as enacted, broadly allows *anyone* injured by the sale of knowingly stolen property to bring a civil action against the seller, in order to reduce thefts by eliminating the market for stolen goods." ' " (*Siry*, at p. 348, quoting *Bell*, at p. 1047.)

" 'This history shows the Legislature believed the deterrent effect of criminal sanctions was not enough to reduce thefts. The means to reduce thefts, the Legislature concluded, was to dry up the market for stolen goods by permitting treble damage recovery by "any person" injured by the knowing purchase, receipt, concealment, or withholding of property stolen or obtained by theft.' " (*Siry*, *supra*, 13 Cal.5th at p. 349, quoting *Bell*, *supra*, 212 Cal.App.4th at p. 1047.)

32

Section 496's amendment history further shows the statute "was designed, not solely to deter theft, but also to provide a new civil remedy to those who have been injured by a violation of the statute." (*Siry*, *supra*, 13 Cal.5th at p. 357, citing *Switzer*, *supra*, 35 Cal.App.5th at p. 131.) This goal " 'was expressly stated in the analysis provided by the Senate Committee on the Judiciary': ' "[E]stablish[ing] a civil remedy for persons who have been injured by another's purchase, concealment, sale, or withholding of property where such person knows the property has been stolen." ' " (*Siry*, at p. 357, fn. 16, quoting *Switzer*, at pp. 131–132.) *Switzer* rejected arguments that the Legislature could not have intended to apply section 496's treble damages remedy to wrongdoing in the context of a joint venture of preexisting business relationship where ordinary fraud and breach of contract remedies would be available (*Siry*, 13 Cal.5th at p. 354), and that the law was to have a narrower remedial focus, applying only to common carriers or to situations involving theft in the cargo industry. (*Id.* at p. 358.)

3. *Analysis*

Guided in part by *Fassberg*, *supra*, 152 Cal.App.4th 720, *Anderson v. Ford Motor Co., supra,* 74 Cal.App.5th 946 and *Los Angeles Unified*, *supra*, 14 Cal.5th 758, we look to section 496's scheme and legislative indications of its purpose, as well as the nature of this litigation and the conduct underlying Turtle Beach's damages awards, to determine whether the treble damages section 496 authorizes functioned entirely or primarily as punitive damages here. If they did, then we must hold that awarding both section 496 treble damages and punitive damages amounts to an improper double recovery, and that the court should have required Turtle Beach to elect its remedy.

33

Under *Los Angeles Unified* (*Los Angeles Unified*, *supra*, 14 Cal.5th at pp. 778–779), the fact the statute provides for treble damages does not, by itself, indicate a solely punitive function. Thus, we are unconvinced by Weisbord's argument to that effect. And that the civil remedy is within a Penal Code provision also does not dictate that the remedy has a solely punitive purpose.

Despite section 496's dual purpose, it is apparent that the statute has "substantial punitive qualities beyond the simple fact that [the treble damages] may go well beyond actual damages." (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 1109.) One such feature is that it authorizes treble damages "only upon proof of morally offensive behavior on behalf of the defendant" (*Los Angeles Unified*, at p. 1109, citing *X.M. v. Superior Court* (2021) 68 Cal.App.5th 1014, 1026), namely theft done with the sort of planning and deliberation amounting to the requisite criminal intent. (*Siry*, *supra*, 13 Cal.5th at pp. 361–362 [observing to prove theft under section 496 a plaintiff must show "criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity' "].) Further, given the proof necessary to establish such intent, it is clear the treble damages of section 496 are "assessed in a case—and fact—specific manner in much the same way that punitive damages are . . . ." (*Los Angeles Unified*, *supra*, 14 Cal.5th at p. 780.)

In our view, the treble damages provision in section 496 aimed *primarily* at punishment and deterrence in this case, and was not outweighed by any compensatory aspect of the law. The jury had already compensated Turtle Beach with an award of its actual damages of $34,262.09, precisely the amount it sought for its costs in hiring a consultant with respect to the stolen personal devices. The evidence showed, and Turtle Beach's counsel made

34

clear, that apart from those costs, Turtle Beach was unable to prove any damage or harm stemming from improper use of the data, because it was unknowable whether or not such improper use had ever happened.[14] To put a final point on the matter, the conduct underlying both the punitive damages award and the treble damages award—Weisbord's failure and intentional refusal to return Turtle Beach's devices and proprietary data to it—is the same.

None of Turtle Beach's arguments convince us that the Legislature's purpose in authorizing treble damages in section 496 is primarily or predominantly compensatory, or that the treble damages in this case served as a compensatory award. Citing *Switzer*, *supra*, 35 Cal.App.5th 116, Turtle Beach acknowledges that the Legislature's purpose of the law is two-fold. This is not enough. Turtle Beach must establish not just *some* remedial function, but that the statute was intended to have or had in this case *predominantly* a compensatory function.

---

[14] Turtle Beach's counsel argued: "[The digital forensics consultant] told you that his firm . . . has billed Turtle Beach so far $17,662 for the work they have done to date, work that was made much more complicated by Mr. Weisbord having, quotes, 'lost' the three original devices so that we will never know what happened to that data. [¶] We don't know if he gave it to someone. We don't know if he gave it to a competitor. We don't know what happened to the data. [¶] And [the expert] said it would also cost an additional $16,600 to remove the data from the new devices. That is, [Weisbord] put some of the data on other devices. I don't know whether they were thumb drives or what kind of storage devices. So they're going to have to go in and get the info off the new devices, to which some of the original data had been transmitted, and that's going to cost an additional $16,600. So that's a total of $34,262, which never—again, never—should never have come to this, if [Weisbord] just lives up to his agreements that he signs, if he says 'Yeah, here's my data back. You take it. Take it off. Give me my computer back and we're all good.' "

35

Turtle Beach asserts the trial court found the award here was compensatory under the circumstances. It points to evidence that Weisbord intentionally withheld Turtle Beach's property for five years, that in litigation Weisbord claimed to have "lost" them, that he "denied Turtle Beach access to the property that he misappropriated long before," and, citing the expert consultant's testimony, that Weisbord "unnecessarily increased the cost for Turtle Beach to locate it." Even if it were proper to imply such a finding by the trial court, it is not supported by the record, in view of the jury's separate award of Turtle Beach's expert costs as actual compensatory damages. The cited evidence does not suggest any *additional* damages Turtle Beach suffered so as to impart a compensatory function to the treble damage award.

Turtle Beach also cites *Los Angeles City Metro Transportation Authority v. Superior Court* (2004) 123 Cal.App.4th 261 without extended analysis. That case involved civil penalties under the Unruh Act, Civil Code section 52, subdivision (b)(2). (*Id*. at p. 276.) The court there held the civil penalty was not barred by the law precluding imposition of punitive damages against the public entity transportation authority. (*Id*. at p. 264.) But the Legislature expressly authorizes the civil penalties of the Unruh Act *in addition* to actual and punitive damages and "[p]lainly . . . regarded these as *separate* remedies." (*Id*. at pp. 266–267.) Further, legislative history demonstrated an emphasis on the nonpunitive element of the civil penalty provision, and reflected "at least two important non-punitive purposes[:] "increased compensation to the plaintiff" and "encourag[ing] private parties to seek redress through the civil justice system by making it more economically attractive for them to sue." (*Id*. at pp. 270–271.) Pointing to the fact that some hate crime victims suffer little actual damages, the court

observed that many such litigants might not have the economic incentive or means to retain counsel, so the "civil penalty clearly provides a minimum compensatory recovery even in those cases where the plaintiff can show little or no actual damages." (*Id*. at p. 271.)

Turtle Beach points to no such predominant purpose with respect to section 496. It argues only that Weisbord's conduct made it "impossible for Turtle Beach to know or recover its actual damages," seemingly suggesting this brings it into a situation like that in *Los Angeles Metropolitan* or distinguishes it from *Fassberg, supra,* 152 Cal.App.4th 720. We think Turtle Beach's assertion that it cannot determine its actual damages or is unable to present evidence that Weisbord misused Turtle Beach's proprietary information does not cut in favor of awarding it *additional* damages. The jury listened to Turtle Beach's counsel's arguments, and awarded what it believed were its actual compensatory damages of $34,262.09. It then found Weisbord acted with malice, fraud and oppression, and also that he engaged in the morally culpable behavior of stealing, warranting a treble damages award. But Weisbord's bad acts underlying the treble damages and punitive damages are the same, and cannot support such a duplicative recovery.

## DISPOSITION

The postjudgment order and judgment are reversed insofar as they award both treble and punitive damages on Turtle Beach's claims against Weisbord. In all other respects the judgment is affirmed. The matter is remanded with directions that the trial court require Turtle Beach to elect either treble compensatory damages or punitive damages, vacate one of the $102,786.27 awards, and enter a new judgment accordingly. The parties shall bear their own costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

DO, J.

KELETY, J.

38